## HOFFMAN and others *vs.* CAROW.

An *auctioneer* who sells *stolen goods* is liable to the owner in an action of *trover*, notwithstanding that the goods were sold by him, and the proceeds paid over to the thief, *without notice* of the felony.

Whether the same rule prevails in respect to *common carriers*, and others, having a mere temporary possession of the property, not claiming title to it, and not converting it into money by sale, *quere.*

It *seems*, that where a plaintiff brings an action in respect to *personal property* in the place where he is *domiciled*, that the law of that place, and not the *lex rei sitæ* governs in respect to the rights of the parties.*

ERROR from the supreme court. Carow brought an action of *trover* in the superior court of the city of New-York,

---

*The law is different *here* from what it is in *England*, in respect to the right of the owner to *pursue* or to *recover the value of stolen property* which has been sold by the thief. In *England*, the owner cannot bring his action against the thief or a purchaser from him, until *after conviction* for the larceny, because by the common law, the private injury is merged in the public wrong. Nor will an action lie there against a *bona fide* purchaser in *market overt*, if he has *parted with the property* previous to the conviction. Neither of these rules prevail *here*. The doctrine that the private injury is merged in the public wrong, is *abolished* by statute, and the English law of *markerts overt* has not been adopted here. Consequently the owner of goods *feloniously* taken, may *here* bring his action to recover the property or its value, without showing a conviction of the thief, and notwithstanding that the purchaser has parted with the property previous to the conviction. The reason why the owner cannot maintain an action in *England* where the purchaser in *market overt* has *parted with the property* previous to the conviction of the felon is, that by the purchase in *market overt* the owner's right of property is *gone*, until the conviction of the thief. If, therefore, previous to such conviction, the purchaser part with the property, the owner in an action of trover cannot prove that the stolen goods were *his property*, and that *while they are so*, they came to the defendant's possession, who converted them to his use, for until the conviction, the owner has *no property* in the goods. Thus it will be perceived that this doctrine rests upon the law of *markets overt*, and that does not prevail here, the law with us depends upon different principles.

against Hoffman & Co. *auctioneers* in the city of *Balti-more*, in the State of Maryland, for a quantity of merchan-dize *stolen* from the plaintiff in the city of *New-York*, and forwarded by the *thief* to the defendants to be sold at auc-tion. The thief was indicted and convicted of the felony in May 1833, *previous* to which time the goods had been sold and the proceeds paid over by the defendants to the thief, *without notice* of the felony. The suit was commenced in October, 1834, against the defendants, who moved for a *nonsuit* on the grounds, that the proceeds of the goods hav-ing been paid over to the thief previous to his arrest, and before the defendants had notice of the robbery, the plaintiff was not entitled to recover; and that at all events under the circumstances of the case, the plaintiff was bound to prove a *demand* and *refusal*. The judge presiding at the trial refused a nonsuit, and charged the jury to find for the plaintiff. The defendants excepted. The jury found a ver-dict for the plaintiff, upon which judgment having been en-tered the defenants removed the record into the supreme court, where the judgment of the court below was *affirmed.* See the opinion delivered by the chief justice, 20 *Wendell,* 22. A writ of error was thereupon sued out removing the record into this court.

*H. R. Winthrop & D. B. Ogden,* for the plaintiffs in er-ror, insisted that though it was true as a general rule that the owner of personal property could not be divested of his right to it without his own act or assent, and that a vendor could not convey a better title than he himself possessed, still that to this rule there were many exceptions. Posses-sion is evidence of right as to personal property, and al-though not always conclusive, yet when it is in a foreign port, (and as to all commercial purposes *Baltimore* is as much a foreign port as is *Canton*, in respect to the owner of property residing in *New-York*,) the interests of com-merce require that possession be considered conclusive evi-dence of property, and that all persons acting in *good faith* upon the strength of such evidence be protected. In *Eng-land,* a purchaser in *market overt* is shielded against the

Hoffman v. Carrow.

owner if the purchase be made in good faith and there be nothing unusual or irregular in the sale. This law arose in England, from the necessities of trade, and although our courts have not adopted it in the cases which heretofore have come before them, it is entitled to consideration, as the present is the first case which has arisen in this state in which it has been sought to be applied to the sale of *stolen property*. Indeed, it is submitted that the necessities of trade are so urgent, that unless possession, unaccompanied by any circumstance to excite suspicion, be deemed sufficient evidence of title to protect all persons dealing in respect to such property, commerce cannot be carried on with safety. Consignees and purchasers, notwithstanding the utmost care, will be exposed to ruin, for no vigilance can protect them, unless, indeed, their transactions be limited to individuals to them *personally* known, or specially *recommended*, which would be imposing a restraint upon trade utterly intolerable. The rule is not universal that a vendor cannot convey a better title than he himself possesses, for in *Parker* v. *Patrick*, 5 *T. R.* 175, a *pawnee* was held entitled to recover goods even against the *owner*, where they had been *fraudulently* obtained from the owner and passed to the plaintiff for a valuable consideration. So in our supreme court it was held that though one obtain goods by a fraudulent purchase, *void as to himself*, yet if he afterwards sells them to a *bona fide* purchaser, without notice of the fraud, the property passes to the latter. *Mowry* v. *Walsh*, 8 *Cowen*, 238. Where is the distinction in principle, whether the owner be deprived of his property by *fraud* or by *felony*, as it respects the liability of a *bona fide* purchaser. In either case it is the want of care of the owner, that has enabled the unlawful possessor to impose upon an innocent purchaser, and of the two, the owner and not the purchaser should be the sufferer. Again: has not the English law of *market overt* been virtually recognized by our statute, 2 *R. S.* 625, § 33, *2d ed.* directing *restitution* to be made to the owner *after conviction* had for the stealing, in anaolgy to the statute 21 *Hen.* VIII? In England, it is held under this statute, that the owner of goods

stolen, prosecuting the felon to conviction, cannot recover the *value of them* in trover, from the person who purchased them in *market overt* and *sold them again before conviction*. *Harwood* v. *Smith*, 2 *T. R.* 750. In this case the auctioneers sold the goods and paid over the proceeds to the thief before conviction. At all events, the defendants below were liable only *for the goods*, had they remained in their possession and on demand there had been a refusal to deliver them up. In *Harwood* v. *Smith*, it was said by Lord *Kenyon*, "if in this case the goods had remained in the defendant's possession at the time of the attainder, that would have altered the case," but having parted with them, he held the action did not lie. Thus clearly intimating that when the owner's right was *restored*, he would only be entitled to recover in case the purchaser remained in possession. Upon every principle of justice this should be so, and even then there would be great hardship in case of advances. When the goods are no longer in the possession of the party receiving them, so that he cannot make *restitution* of *the goods*, and where he has been a mere *conduit* for their transmission from the hands of one to another ; *where in fact he has not converted them to his own use*, but has been the *innocent* agent of an artful felon who alone has converted them to his use, he ought not to be held answerable for their value. So the law was held in *Greenway and another* v. *Fisher and others*, 1 *Car. & Payne*, 190, where it appeared that one of the defendants was a *packer*, who merely shipped goods which had been pledged by *factors* for their own debt. It was insisted in his behalf, inasmuch as he only acted in the regular discharge of his duty, the work being done according to directions, that no wrong in the transaction between other parties would affect him ; that if it were not so every *porter* and every *carrier* would be liable as well as a *packer*. Abbott, Ch. J. said : "On the part of Woodward, reliance is placed, and I think properly, on the circumstance of his acting in the ordinary course of his business, and I am of opinion that the course of trade in this instance furnishes an exception to the general rule. The distinction between this case and that of a *servant* is,

that here there is a *public employment* ; and as to a *carrier*, if while he has the goods, there be a demand and refusal, trover will lie : but while he is a mere conduit pipe in the ordinary couse of trade, I think he is not liable." This principle had been previously acknowledged by the supreme court of this state, in *Thorp* v. *Burling and others*, 11 *Johns. R.* 285, in which it was said that a *cartman* would not have been held liable to an action of trover for removing goods, had there not been circumstances sufficient to put him on his guard as to the *legality* of the taking. The case of *Cooper* v. *Chitty*, 1 *Burr.* 20, cited on the other side, where the sheriffs were held liable in *trover* for selling the goods of a bankrupt, the judgment was placed expressly upon the ground that the defendants *knew* of the bankruptcy *previously* to the sale. Finally, for aught that appears, the auctioneers under the circumstances of this case, were not liable to the owner of the goods by the laws of *Maryland*, the place where the goods were at the time of the sale.

*I. Anthon*, for the defendant in error, submitted the following points and authorities :—

1. The goods in question having been stolen, and delivered by the felon to the plaintiffs in error to sell for him, such delivery conferred no authority on them to make sale of the goods, and such sale was a conversion. *Pell* v. *Humphrey*, 2 *Adolph. & Ellis*, 500. *Stephens* v. *Elwell*, 4 *Maule & Selw.* 260. *Cooper v. Chitty*, 1 *Burr.* 20. *Smith's Leading Cases*, 220. *Potter* v. *Starkie, cited* 4 *Maule & Selw.* 260. *Everett v. Coffin*, 6 *Wendell*, 609. *Williams* v. *Merle*, 11 *id.* 80. 2 *Kent's Com.* 320, 323. *Farrington* v. *Payne*, 13 *Johns. R.* 431.

2. The payment of the proceeds of such unauthorized sale to the felon, did not discharge the plaintiffs in error from their responsibility for such conversion, to the rightful owner. *Potter* v. *Starkie, cited* 4 *Maule & Selw.* 268. *Isaac* v. *Clark*, 1 *Buls.* 312.

3. The true owner has a right to reclaim his property and to hold any one responsible who has assumed the right

to dispose of it. *Williams* v. *Merle*, 11 *Wendell*, 80. 2 *Kent's Com.* 320, 323. *Isaac* v. *Clark*, 1 *Buls.* 312.

4. The fact that the plaintiffs in error were auctioneers, does not vary their responsibility to the rightful owner of the stolen goods sold by them. Such a doctrine would make every auction room a market overt.

After advisement, the following opinions were delivered:

By the CHANCELLOR. The simple question presented for our decision in this case is, whether the purchaser of stolen goods, who afterwards sells them as his own to a *bona fide* purchaser, is liable to the owner of the goods, in an action of *trover* for such conversion thereof to his own use? One of the members of this court, upon the argument, supposed the bare statement of such a case was sufficient to enable the court to decide it without further argument: and I thought so too, until one of the learned and very able counsel for the plaintiffs in error assured us he was sincere it believing the action could not be sustained, and referred to a case from the English Term Reports, which was apparently a decision in favor of his clients. To understand that case, therefore, and to distinguish it from the present, I have found it necessary to bestow a little more time upon the examination of this subject than I should have otherwise deemed it my duty to give to it.

It is known to the professional members of the court, that in the market towns of England there are periodical fairs, where property is bought and sold, called market days; and that by the custom of the city of London, every day except Sunday, is a market day, and every tradesman's shop is a market overt for those things in which he usually deals at that place; and that by the common law, a sale in a market overt actually changes the title to the property in favor of a *bona-fide* purchaser thereof, even though it has been stolen from the rightful owner. 5 *Coke's R.* 83, *a.* The only remedy of the owner of stolen property to recover it again, under such circumstances, at the common law, was to pursue his *appeal* against the felon to conviction, and

then he was entitled to restitution of his goods, although they had been sold in a market overt. *Coke's 2d Inst.* 714. So, also, if goods were stolen, and the thief abandoned or waived them in his flight, they were forfeited to the crown, or the lord of the manor, unless the owner proceeded upon his *appeal* to attaint the thief. *Foxley's case*, 5 *Coke*, 109, *a.* But as this proceeding to convict the felon by a private suit was very inconvenient and expensive to the owner of stolen property, the statute 21 *Hen.* VIII. *ch.* 11, was enacted, by which the stolen goods were directed to be restored to the owner upon his procuring a conviction of the thief, upon an *indictment* in the ordinary way, without the necessity of an appeal. *Staunf. P. C. ed. of* 1583, *p.* 167. Under this statute, it is the settled law in England, that upon the conviction of the offender, the owner is entitled to be restored to his property, notwithstanding it may have been sold to a *bona fide* purchaser in a *market overt. Burgess* v. *Koney, Trem. P. C.* 315. *Coke's 2d Inst.* 714. *J. Kelyng's R.* 48.

In the case of *Horwood* v. *Smith*, 2 *T. R.* 750, relied on by the counsel for the plaintiffs in error to show that they could not be liable for a conversion of these goods which took place before the conviction of the thief in May, 1833, there had been an actual sale of the stolen property to *Smith*, the defendant, in a *market overt.* The title of the owner was therefore absolutely divested by this sale, so that Smith, the defendant, could not be guilty of a conversion as to him, by afterwards selling the sheep to another person, before the plaintiff's right to the property had been *restored* by a conviction of the felon. By a reference to the opinion of Mr. Justice BULLER in that case, it will be seen that he puts the decision upon that ground ; and the language put by the reporter into the mouth of Lord KENYON, that the title to the stolen property was *in dubio* previous to the sale to the defendant in the market overt, I shall presently show is not considered as law, even in England. The case under consideration, therefore, differs from *Horwood* v. *Smith.* in this ; that there had been a sale in market overt in that case previous to the alleged conversion, and

the title which Smith acquired by that sale was not divested by the subsequent conviction until long afterwards, which conviction was considered as giving the original owner a new title to the property ; whereas, in the present case, there never had been any sales in a market overt, to convey any title to the defendants which required to be divested by a conviction. Whether there are any markets overt in *Maryland*, where the defendants purchased this property from the thief, I do not know ; but if there are, there was no attempt to prove on the trial that they purchased the property in a market overt ; and the learned Judge Blackstone, " the English Justinian," says, in so many words, that " if my goods are stolen from me and sold out of market overt, my property is not altered, and I may take them wherever I find them." 2 *Black. Comm.* 449. *See also Foxley's case*, 5 *Coke's R.* 109, *a* ; and *Kelham's Laws of Wm. the Conqueror*, 73, *Law* 44.

The case of *Parker* v. *Patrick*, 5 *Term. Rep.* 175, depends upon an entirely different principle. The goods in that case were obtained by *fraud* and not by felony. The sale to the fraudulent vendee was, therefore, not void, but only voidable at the election of the vendor ; and as the vendee had pawned them to an innocent person for a valuable consideration, the pawnee was permitted to hold them as against the owner who had enabled the vendee to obtain property of the defendant, upon the security of property which had apparently been sold to the pawnor, so as to give him the legal title thereto. *Morey* v. *Walsh*, in our supreme court, 8 *Cowen Rep.* 238, was decided in favor of the *bona fide* purchaser from a fraudulent vendee, upon the same principle ; although it will be seen the chief justice said in that case, that in this state where we had no market overt, a sale of *stolen* goods would not divest the title of the owner. The same distinction between the cases of goods obtained by *fraud* and goods obtained by *felony*, is noticed by Lord DENMAN in *Peer* v. *Humphrey*, 1 *Harr. & Woll. Rep.* 28, which is also a direct authority in favor of sustaining the judgment of the supreme court in the present case. Indeed it is a case upon all fours with this, and makes the distinction, which I have been endea-

Hoffman v. Carow.

voring to explain, between *Harwood* v. *Smith*, and the case which we are now to decide. The servant of the plaintiff stole three oxen and a heifer from him and sold the three oxen to the defendant for cash, but the sale was not in a market overt; the thief was afterwards taken and convicted, but before the conviction the defendant had sold the cattle to other persons. After the conviction of the thief the plaintiff brought his action of trover against the defendant, for the previous conversion, as in this case, and recovered the value of the cattle. Upon the case being brought before the court of king's bench, the counsel for the defendant cited *Horwood* v. *Smith*, and referred to what Lord Kenyon said as to the property being *in dubio* between the felony and the conviction. To which Lord C. J. DENMAN replied " that must be a mistake, or the consequence of the judgment having been delivered hastily," and in giving his opinion afterwards, he said that in the case then under consideration the property in the cattle never was divested out of the true owner ; but that a sale in market overt gave a *prima facie* right of property. Justice LITTLEDALE says "as the defendant did not purchase in market overt, he acquired no title whatever in the cattle : that remained in the plaintiff, and therefore the defendant's subsequent sale of them, amounted to an act of conversion." And Justice WILLIAMS said that *Horwood* v. *Smith* merely laid down that a party by purchasing in market overt acquired a property in the thing stolen ; but as the purchase in the case they were then considering was not such a sale, no property passed to the defendant in point of law and was never divested out of the plaintiff. The verdict therefore was directed to stand. It appears by this case, and also by that of *Gainson* v. *Woodfull*, 2 *Car. & Payne*, 41, that the courts in England will not sustain a suit in favor of the owner of the stolen property, either against the thief or against a purchaser from him, until he has proceeded criminally against the thief for the felony. The practice undoutedly proceeds upon the ancient common law principle that the civil injury is merged in the felony ; but as the revised statutes of 1801, which abolished appeals of felony in this

state, also declared that the civil remedy should not be merged in the felony, or in any manner affected thereby, this English rule does not apply to suits commenced here. 1 *R. L.* of 1801, *p.* 264. In the present case, however, the plaintiff had convicted the thief before the commencement of his suit. He was therefore entitled to recover according to the English practice.

I have no doubt that the decision of the court below, was correct; and the judgment should be affirmed.

By Senator EDWARDS. In this case it is clearly shown that Carow had the title to the property. This title he could not be divested of, but by his own consent or by the operation of law. He did not consent to part with the property because it was stolen from him, and the question is, has he been divested of it by the operation of law since the felony.

The sale of the property at public auction could not divest the owner of his rights. No one can transfer to another a greater interest in personal property, than he or the principal for whom he acts, possesses. This is one of the fundamental principles by which the right to personal property is tested in cases of sale, and is of great antiquity, " *Nemo plus juris in alium transferre potest, quam ipse habet,*" was considered a sound and salutary principle of the civil law in France and Scotland, even in the time of *Pothier* and *Erskine.*; and although England has departed from it in one instance in the law of market overt, yet that law has never been adopted in this country, and whenever the question has been presented to American judicial tribunals it has been repudiated. *Wheelwright* v. *DePeyster*, 1 *Johns. R.* 480. *Dame* v. *Baldwin*, 8 *Mass. R.* 518. 1 *Yeates R.* 478. 2 *Kent's Comm.* 324. As to the question therefore under consideration, it is wholly immaterial whether the property be sold at public auction by an auctioneer or at private sale by any other individual; the owner's rights cannot be affected in the one case more than in the other, nor can the purchaser acquire any greater interest in the one case than in the other. Disposing of or assuming to dis-

pose of another's property without his consent, unless by the operation of law, is a conversation for which this action lies. *Everett* v. *Coffin,* 6 *Wendell's R.* 609. 4 *Maule & Sel.* 259. *McCombie* v. *Davis,* 6 *East. R.* 538. *Parker* v. *Godin,* 2 *Strange,* 813. *Wilbraham* v. *Snow,* 2 *Saund.* 47. 2 *Phiilipp's Ev.* 121. Nor can even a bona fide purchaser protect himself under such a sale. The doctrine of *caveat emptor* applies, and he is liable to the action of trover by the real owner, notwithstanding his purchase. *Williams* v. *Merle,* 11 *Wendell* 180. *Prescot* v. *De Forest,* 16 *Johns. R.* 160. Were the rule as conteded for by the counsel for the plaintiffs in error, all the felon would have to do to divest the owner of the right to his property, would be to place it in the hands of an auctioneer as soon as stolen, and cause a sale to be made of it; a rule of law that would thus encourage felony and deprive the owner of his property, would be as absurd as unjust.

When property is taken without legal authority or the consent of the owner, it is unnecessary for him to make *demand* before action brought. When he has once consented to part with the possession, in some cases it is necessary to make a demand to show a conversion, but when the possession is wrongfully taken, there is a conversion and no demand is necessary.

The revised statutes have not altered the nature of this action in a case like the one we are now considering, as the counsel would seem to suppose from his argument. The statute is intended to make provison relative to stolen property, where it has been arrested from the felon, and is in the custody of some legal officer, but does not extend to a case where the felon has delivered the property to an auctioneer to make sale of it for his benefit. I am therefore for affirming the judgment.

By Senator FURMAN. No case like the present has ever been decided by this court; and it is of the utmost consequence that an adjudication, having the important bearing that this promises to exercise upon the commercial interests of our country, should not be determined until after a pa-

tient investigation of the principle in all its bearings, and a due examination of the adjudged cases under which the doctrine is sought to be established, and of the facts and circumstances under which they were decided.

The principle rests in the common law, that a felon does not acquire any title to the goods stolen, that he cannot transfer title even to a *bona fide* purchaser, and that the owner may take his goods which have been so stolen whereever he can find them. But it was very early discovered, that the commercial interests of the English nation required that some exception should be made to this general rule, and it was for that purpose that the courts in that kingdom held that the principle did not apply to sales made in *market overt;* and that sales made under such circumstances should convey a title to the *bona fide* purchaser, although the property might have been stolen. Even this exception was not found sufficiently broad to meet the wants of a trading community, in which it is absolutely necessary, for the well being of society, that a *bona fide* purchaser should be protected in his possession of personal property; and the exception was still further extended to sales made in public shops in the city of *London.* It is well to remark here, that in England such markets overt are held, either by prescription or by charter, and in no instance does the charter declare that sales made therein shall be conclusive; but the doctrine has arisen from the exigencies of trade, and has been adopted with a view to protect and favor the commercial interests of that country. But it is said by our courts, and with truth, that the principle of sales in market overt, as it exists in England, has no application to this country. Although this is admitted, yet I may be allowed to express my surprise, that, with our trade and commerce, we should have no similar doctrines or principles to protect it, but that, on the contrary, we should seek to establish a rule which governed England in the infancy of its commerce, which was adopted by its courts at a period when it had no manufactures, and its whole trade consisted in raising wool and exporting it to Flanders to be wrought into cloth, and which was repudiated by those courts at a pe-

Hoffman v. Carow.

riod when the commercial relations of that country were not of one quarter the importance or value of those of our own country at the present time. . My surprize has not been diminished, when I find that almost every commercial nation, ancient as well as modern, beside our own, had found it necessary to adopt some such doctrine.  It was wisely provided by the laws of *Athens*, that all lawsuits relating to commerce should be carried on in the six months during which ships were not accustomed to put to sea, to the end that they might not lose their voyage by the impediment of legal prosecutions.  On the contrary, we, although depending on foreign commerce for our prosperity to a much greater extent than ever the inhabitants of that ancient state did, hold a mere commercial agent liable in damages, at any time within six years, for an act honestly done by him in the course of business, and that even without a previous demand before the suit is instituted.  In the *Roman state*, Ulpian speaks of the great privileges granted by the government to merchants, and gives for it the general reason, because navigation is of the greatest service to the state.

In *England*, the plaintiff could not recover merely because the goods had been stolen, without that fact having been first judicially ascertained.  Before the statute of the 21 Henry VIII., the owner was not entitled to a restitution of the stolen property, even upon the conviction of the felon on indictment, but could only obtain the same by prosecuting an appeal.  After the enactment of that statute, appeals were disused, and were rendered unnecessary, because the court might, on the conviction of the felon, award restitution ; and the courts are now in the habit of doing so.  Our own statute, 2 *R. S.* 747, § 33, adopts the English statute on that point.  In England, the action under the award of restitution cannot be maintained against any one except him who shall be *in possession* at the time of the conviction or attainder ; and a demand is also requisite before the action is brought.  6 *Mod.* 412.  The reasonable inference from this statute, and the manner of proceeding, seems to be that in the case of stolen property, the title of the plaintiff,

so far at least as to enable him to maintain *trover*, is not established before the conviction or attainder ; at any rate, he is not before then entitled to a restitution under the statute. 2 *Carr. & Payne*, 41, *and note*. It does not appear from this case, that the felon was convicted of the felony charged before this suit was brought ; but it does appear that the proceeds of the sale of the goods in question were paid over to him before he was even arrested. Our statute does not authorize the plaintiff to recover his goods from any one who may at any time have had the goods in his possession, but, merely authorizes a recovery in general terms. The statute, 2 *R. S.* 747, § 34, seems to recognize the principle, that under certain circumstances, although the property has been stolen, a good title may be conveyed by a person not the owner, or at least, a title sufficient to protect a *bona fide* purchaser from an action of trover, for that section provides, that " if stolen property shall not be claimed by the owner thereof before the expiration of six months from the time any person shall have been convicted of stealing such property, the magistrate, sheriff, constable, or other officer, or person having the same in his custody, shall deliver such property to the county superintendents of the poor, on being paid the reasonable and necessary expenses incurred in the preservation thereof, to be appropriated to the use of the poor of such county." This enactment is made notwithstanding that by the general law of the land, the owner is entitled to six years within which to bring his action ; and certainly the legislature cannot be presumed to have intended to authorize an illegal disposition of another's property.

But there is a stronger and more express exception to this general principle, which is to be found in the case of negotiable bills of exchange and promissory notes where possession is *prima facie* evidence of property, and a *bona fide* holder can recover upon the same, although a bill or note came to him from a person who had stolen or robbed it from the owner, provided the *bona fide* holder took it innocently in the course of trade for a valuable consideration, and under circumstances of due caution. Suspicion must first be cast upon the title of the holder, by

Hoffman v. Carow.

showing that the paper had got into circulation by force or fraud, before the burden is thrown upon him of showing how he came by it, and what consideration he gave for it. This protection is, for the sake of trade, given to the holder of negotiable paper, who receives it fairly in the way of business; and why the same principle should not be applied to other personal property which passes through the hands of an individual fairly, in the course of trade and without notice, is difficult to imagine. If Lord Mansfield, with his clear and comprehensive mind, felt himself called upon, *ex necessitate rei*, to depart from the common law, and to establish the principle above stated in the case of negotiable commercial paper, it cannot for a moment be doubted, that if the judges who proceded him had not deemed it necessary to protect the innocent *bona fide* purchaser, by the doctrine of sales in market overt, that the great founder of English commercial law would have extended the same principle to all other property the subject of mercantile transaction.

It is the boast of the common law, that it accommodates itself to the growing wants of a thriving commercial people ; and it has not been in bravado merely, that this has been put forth ; but in the hands of the venerated sages of the English bench, it has been practically applied. What did the age of Henry VIII., when the " Great Abridgement of the Statutes of the Realm" formed a single volume but little larger than a pocket Bible, know of the law of bills of exchange and promissory notes, or of the law of insurance and shipping? Nothing. All this, and a thousand fold more, has been engrafted upon it by judicial legislation, until it has truly become the collected wisdom of ages. " *Ita lex scripta est*" was not regarded by those sages, as it is too much the case in our day, a sufficient answer to an argument however cogent, for the establishing a new principle arising from the wants of the community ; but with them it advanced and expanded to meet those wants. A tame subserviency to precedent would have prevented all the improvements in that body of law, which have been the means of rendering it the admiration of the world ; and we have

great cause for thankfulness, that such was not the course pursued in the country from which we have derived our institutions as well as our law.

On the part of the defendant in error, it is contended that the goods in question having been stolen, the delivery conferred no authority on the plaintiffs in error to sell them; that such sale was a conversion; and that the payment of the proceeds to the felon, although without notice or knowledge of the felony, does not discharge the plaintiffs in error from responsibility to the right owner, who it is insisted has a right to reclaim his property, and to hold any one responsible who has assumed the right to dispose of it; and that the fact of the plaintiffs in error being auctioneers does not vary their responsibility. On the argument of these points a number of authorities were cited; in the examination of which a short time may not be unprofitably spent in order to ascertain what were the facts and reasons which led to their decision. Among the cases on which the council for the defendant in error relies to sustain the recovery against the plaintiffs in error, is that of *Peer* v. *Humphrey*, 2 *Adol. & Ellis*, 500, in which the property was stolen and sold to the defendant who was a *bona fide* purchaser. Two days after the sale, the plaintiff having discovered his property in the defendant's possession gave him notice that it had been stolen from him, and demanded possession, which was refused. Three months after this notice and demand, the defendant sold the property in market overt and appropriated the proceeds to his own use. The thief was convicted of the felony on the prosecution of the plaintiff; and afterwards, the plaintiff brought an action of trover and recovered against the defendant. Here it will be noted that the property having been sold by the defendant in market overt, the plaintiff could not follow it up, and could not recover of any other person than the defendant. No one, however, would feel much reluctance in sustaining such a judgment, for the defendant was possessed of the property at the time of the demand, and disposed of it three months after he had received notice that it had been stolen. So if the auctioneers in this case had sold the goods of Ca-

row, after they had notice of the felony, and after he had demanded the goods from them, and had then paid over the money to the felon, it would be a parallel case with that cited.

The next case is that of *Stephens* v. *Elwall*, 4 *Maule & Selw*. 259. That was trover—the plaintiffs were the assignees of a bankrupt, who being possessed of the goods in question, sold them after his bankruptcy to one Deane, to be paid by bills on Heathcote, who had a house of trade in London, and for whom Deane bought the goods. Heathcote was in America, and the defendant was his clerk, and conducted the business of his house. The goods were delivered to the defendant, who sent them to Heathcote in America. A demand was made on the defendant before suit brought, but not until after the expiration of nearly two years from the purchase. The defendant was held liable. It is not difficult to see that this case rests mainly upon the principles governing bankruptcy cases in England. In that case, *Potter, assignee* v. *Starkie*, decided in England in 1807 is cited, and is also referred to by the counsel for the defendant in error. There the court held the sheriff liable in trover although he had seized, sold and paid over the money before the commission of bankruptcy issued, and before notice, but after the bankrupt had committed the act of bankruptcy. The courts in England have in all these bankrupt cases invariably, held the doctrine, that after an act of bankruptcy, the bankrupt cannot by sale pass the title to any of his goods or property, or in any way divert the same from the satisfaction of his justs debts ; and that from that moment, the property belongs to his assignees to be appointed under the commission. This doctrine forms a part of the policy of the commercial law of England ; and arises from the fostering and protecting care which the courts of that nation exercise over their commercial interests. It is based upon the same principles which have induced the courts to sustain the exception in favor of sales in markets overt, and the peculiar custom as to sales in public shops in the city of London.

The case of *Cooper* v. *Chitty*, 1 *Burr*. 20, is another of these bankrupt cases, and was trover brought by the assignees of Johns, a bankrupt, against the sheriffs of London, who had seized and sold goods in the possession of the bankrupt under a fi. fa. The facts were these: Johns committed the act of bankruptcy, Dec. 4, 1753. Dec. 8, he was declared a bankrupt and the commission issued; and on the same day, the assignment was made. Twenty days after, the sheriffs sold the goods on a judgment recovered against Johns after the act of bankruptcy was committed. It is difficult to see what question there could be about this case; and in the decision of it, Lord Mansfield says, it is admitted that the property was by relation in the plaintiffs as and from the 4th of December, (which was before the seizure by the sheriffs, and in fact before the judgment was recovered,) that this relation, by the statutes concerning bankrupts, was introduced to avoid frauds. And the court held the defendants liable, on the ground that the conversion was twenty days after the assignment, and that the sheriffs ought not to go on to a sale *after a full discovery* that the goods belonged to 'a third person. The 'principle I agree should be held applicable to the cases of stolen property. A party should be held liable if *after a fall discovery* that the goods belonged to a third person he proceeds to a sale; but not otherwise.

As to these bankrupt cases, it was very early found necessary in governments which authorized personal arrest and imprisonment for debt, to interpose and provide relief to the debtor in cases of inevitable misfortune; and this has been especially the case in respect to insolvent merchants, who are obliged by the habits, the pursuits, and the enterprising nature of trade, to give and receive credit, and to encounter extraordinary hazards. Thus we find the *cessio bonorum*, or *cessio miserabilis*, was established at Rome, by the Julian law; and when a person applied for the benefit of that law, the creditors had their election either to grant to the insolvent a letter of license for five years, or to take a general assignment of all his property on condition that he should not be imprisoned—a provision creditable to the

Hoffman v. Carow.

general intelligence of that early period ; and one better adapted to the exigencies of a commercial nation than the laws now existing either in England or this country. Bankrupt and insolvent laws are designed to secure the application of the effects of the debtor to the payment of his debts, and then to relieve him from the weight of them. Under these laws the title of the bankrupt to the remnants of his property, becomes absolutely vested in the assignees. These laws are in the nature of a contract between the government and the mercantile portion of the community, that if, in the event of misfortune, they will surrender all their property and effects to the satisfaction of their creditors, the government will discharge them from the penalty consequent upon their failure to meet their engagements, and it is the duty of the courts to see that it is rigidly complied with on the part of the bankrupt debtor. But the principles which the courts in England have found it necessary to adopt, in order to oblige a *bona fide* application of all the effects of the bankrupt to that object, cannot reasonably be extended beyond that class of cases, for the purpose of deciding others which rest upon different principles.

Having thus gone through with an examination of the English cases cited and relied upon by the counsel for the defendant in error, to sustain the judgment below, it is seen that in all of them are to be found facts which induce us to yield our assent to their decision. In each of them we discover that notice of the state of the case was brought home to the defendant *while he remained in the possession* of the property in dispute ; and in all of them we find that a *demand* was made before suit brought. Among those cases, three of them, viz : that of 4 *Maule & Selw.* 259, that of *Potter, assignee,* v. *Starkie, also cited in that volume,* and that of 1 *Burr.* 20, are cases decided upon the peculiar principles which govern the bankrupt laws of England ; and there is but one case, that of 2 *Adol. & Ellis,* 500, which is similar to that in question, and the facts which it appears it was deemed necessary to prove in that case to warrant a recovery, go far to sustain some of the objections taken here by the plaintiffs in error against this judgment. The

Hoffman v. Carow.

result is, that I do not find that any of those cases carry the doctrine sought to be enforced by the defendant in error, to the extent to which it has been carried by the decision of the supreme court in the present case. It is now necessary to make a similar examination of the cases in our own courts in order to see in what light they view this principle deducible from the common law.

The first of our own decisions by the supreme court, cited by the counsel in support of the doctrine laid down by the court in this case, is that of *Everett* v. *Coffin*, 6 *Wendell*, 603. The facts in that case were, that Collins, the master of the brig Dove, at New Orleans, signed a bill of lading that Bridge & Vose had shipped in her for New York, 179 pigs of lead, to be delivered to Tufts, Eveleth & Burrell, or their assigns, on paying freight. A letter was in evidence, showing that it was shipped on account and risk of Otis Everett, of Boston. The brig arrived in distress at Norfolk a portion of the lead was sold to pay expenses, and the balance was transferred to the schooner Dusty Miller, for New York, a bill of lading was taken to deliver the property to Captain Collins, (which was undoubtedly with a view to secure the freight and expenses,) and the captain of the schooner, by order of Collins, delivered the same to the defendants. Tufts, one of the original consignees, called on the defendants, who shewed him the bill of lading from Norfolk, made to Collins, and endorsed by him to the defendants, and told him that the lead had come to hand, and had been sold and the money received; that the contract of sale was made by Collins; that the defendants had become responsible for the freight and average and had advanced money to Collins. It does not appear from the case, that they had ever accounted with Collins and paid over to him the balance after satisfying their responsibilities and claim; but the inference is, that they had the whole proceeds of the sale then in their possession, or had appropriated the same to their own use. The circuit judge nonsuited the plaintiff. The questions argued by the counsel in the supreme court were, whether the plaintiff had sufficiently proved his right to the property to maintain the

Hoffman v. Carow.

action ; and, whether the defendants had a lien upon the same, and could retain it for the satisfaction of that lien. The court, by Justice Sutherland, in deciding the case, held, that the evidence of the right, and the demand and refusal was sufficient; that Tufts, one of the original consignees, had full legal authority to do all that he did ; and also, that the defendants had a lien on the property, which should have been paid or tendered before the suit was commenced ; that the plaintiff's right of action was not complete until the lien was satisfied ; and the court conclude by deciding that the plaintiff was properly nonsuited. This, in fact, decides the whole case, and every question that could be properly raised, or was raised, as appears from the report. There is no pretence that the property was feloniously taken from the plaintiff, for there is no principle better settled than that without an express agreement, the master of a ship is not bound to part with the goods until the freight be paid ; and if the regulations of the revenue require the goods to be landed and deposited in a public warehouse, the master may enter them in his own name, and thus preserve his own or his owner's lien. In that case the defendants, by the assignment of the last bill of lading, stood in the place of the master ; and the same rule also applies to the average on the loss. The court, however, proceed to lay down some general principles, which they were not necessarily called upon to do by any of the facts or circumstances in that case, as they appear by the report of it ; and they say that " the disposing or assuming to dispose of another man's goods, without his authority, is the gist of this action ; and it is no answer for the defendants that they acted under instructions from another, who had himself no authority "—and cite in support of that position the cases of 4 *Maule & Selw.* 259, and 1 *Burr.* 20, which have been before examined and the bearing of them shewn. There is no doubt that the law as laid down by the supreme court, as to disposing of the goods or property of another, without authority is correct; but in that case the defendants had authority to hold possession of the property under a lien. It is however, but a general principle ; and like all other general

rules or principles has exceptions, which I have before advert-
ed to. Every case attempted to be brought under it must de-
pend upon its own peculiar state of facts as the same came
out in proof, to ascertain whether it belongs to the rule, or
attaches to one of the exceptions. That dictum, however,
which is incidentally mentioned in the course of the opinion
of the court, together with a similar one in 8 *Cowen*, 238,
which was in a case of fraud, and not of felony, seem to
have formed the basis of the subsequent decisions of that
tribunal. And the next succeeding case is the first one that
applies that principle in its broadest sense to the facts of the
case.

In *Williams & Chapin* v. *Merle*, 11 *Wendell*, 80, the
facts were these : Nov. 1, 1829, the master of a tow-boat,
by mistake, took 4 barrels of potashes from a warehouse in
Albany, and discovering his mistake when in New-York,
delivered them to the clerk of the agents of his principals,
who took them to an inspector's office on the 3d of Nov.
following, obtained a certificate of inspection, and on the
6th of the same month sold them to the defendant, a pro-
duce broker, who purchased them for a Mr. Patterson, at a
fair price, and received the inspector's certificate. On the
10th of November, the defendant took the ashes from the
inspector's office, and shipped them to the order of his prin-
cipal. About the first of September, in the following year,
the plaintiffs demanded the ashes of the defendant, who re-
fused to account for them, saying he had purchased and
paid for them a year preceding the demand. The circuit
judge, Edwards, intimated his opinion, that if the defendant
had acquired the property *bona fide* by purchase, in the reg-
ular course of his business as a produce broker, and had
disposed of the same *bona fide*, pursuant to the instructions
of his principal, before suit brought, the action would not
lie. He, however, refused to nonsuit the plaintiffs, and the
jury, under his direction, found a verdict for the plaintiffs
for the value of the ashes, and interest. The case was
brought to the supreme court for revision; and that court,
in following up the general principles mentioned in the cases
of *Mowry* v. *Walsh*, and of *Everett* v. *Coffin and others*,

Hoffman v. Carow.

decided that the defendant was liable, and that the owner of property cannot be divested of it but by his own consent, or by operation of law, and that the purchaser acquired no title. The circuit judge took such a view of the facts and of the legal principles which should be applied to them, as seems to commend itself to our common sense of justice; and such an one as the equity of the case would seem to require—which was to leave the plaintiffs to their remedy against those who actually converted and sold their property, and had appropriated the proceeds to their own use; but not allow them to sustain an action against an innocent party who was only the agent for the purpose of transmitting the property from the hands of those who had so converted it, to those of a third person. Not that there was any doubt about the general rule of law, as laid down by the court in reviewing the case; but because the defendant was in a business well known to the commercial community as an agent, a produce broker, transacting that business *bona fide*; and because the great and important interests of the community required that those men should not be rendered liable in damages for acts done by them without the intent of committing a violation of law. The reasonable presumption would be, that if such a doctrine should be sanctioned by the higher courts, and thus become the settled law of the land, these agencies would be broken up, to the great annoyance and expense, as well of the merchants as of the planters; thus affecting not only the commerce but the agriculture of the country; or at the least be the cause of creating very serious impediments in the way of the transaction of that business which has been for several years past peculiarly appropriated by that class of men; and which constitutes a very large amount of the whole business of the country. The only ground upon which a party should be held liable, is that he has the property or its value in his possessisn, or has with knowledge or under notice, illegally disposed of it; and not by reason of having been the mere conduit for its transmission from one to another, and that without notice or knowledge of any claim having been set up to the property by a third person. I

am inclined to think there is a slight mistake in the case as reported in relation to the doctrine held by the circuit judge; in which he is made to intimate that if the defendant had, in addition to the other circumstances by him stated, "disposed of the property *bona fide*, pursuant to the instructions of his principal *before suit brought*, the action would not lie;" and that he intended to have been understood as intimating, that if the defendant had in addition to those other circumstances, disposed of the property *bona fide*, pursuant to the instructions of his principal *before notice*, or *demand* made, the action would not lie. That would make the doctrine conform to that deducible from the English cases, and to what I believe to have been the law in this state before the case of *Mowry and others* v. *Walsh*, 8 *Cowen*, 238, which was decided in 1828, although I cannot see that the decision of that case, viewed in a proper light, militates against that rule.

This disposes of the adjudged cases cited on the argument of this cause—there are however two cases referred to by the learned chief justice in delivering the opinion of the supreme court, which should here be noticed. The first is that of *Mowry and others* v. *Walsh*, above mentioned. There goods were obtained from the plaintiffs by means of a forged recommendation, and a promise to pay whatever amount the plaintiffs might let him have—after thus obtaining the goods, the party obtaining the goods, took them to Lansingburgh, and sold them to the defendant for considerable less than the prices which had been charged him by the plaintiffs at the factory—the defendant's clerk however, testified that the price paid was a fair one. The plaintiffs afterwards *demanded* the goods, and the defendant refused to surrender them and an action of trover was brought. The circuit judge held that the goods were obtained fraudulently but not feloniously, and the defendant having bought them *bona fide* without notice of the fraud, the plaintiffs could not recover; and a verdict was rendered for the defendant. The case was brought before the supreme court, and that court supported the decision of the circuit judge, and held that it was a case of fraud, and not of felony or larceny

Hoffman v. Carow.

and that the finding of the jury and the testimony establish-
ed the fact that the defendant purchased without notice of
the fraud; that although as between the orignal parties to
the contract, the sale was void in consequence of the fraud,
yet if that original fraudulent purchaser afterwards sold the
goods to a *bona fide* purchaser without notice of the fraud, the
property passed, and the court would protect him in the
possession thereof. Although this decides the whole case
which was brought up for examination, the court also lay
down the general principles of law as applicable to cases of
stolen property—that if the goods were taken feloniously·
no title passed from the owners, and they might pursue and
take their property wherever found; that such is the law in
England unless the goods are sold fairly in market overt, and
that having no such market here, the sale can have no oth-
er effect than mere private sales in England. In deciding
the case last mentioned, the supreme court cite that of *Par-
ker v. Patrick,* 5 *T. R.* 718, as being in favor of the de-
fendant; which is the same case cited by the counsel for the
plaintiffs in error on the argument of the question. In *Par-
ker v. Patrick,* the goods had been fraudulently obtained of
the defendant and pawned to the plaintiff for a valuable con-
sideration, without notice of the fraud. After the conviction of
the offender, the defendant obtained possession of his goods,
but by what means does not appear. The plaintiff brought an
action for their recovery, and it was contended that he, al-
though an innocent pawnee, could not recover, as he derived
title through a fraud, and was like a person deriving title
from a felon. But Lord Kenyon thought the cases distin-
guishable, and the plaintiff had a verdict. A motion to set
aside the verdict was denied, and the court held that the
statute of 21 *Hen.* 8, *ch.* 21, did not extend to cases of
*fraud,* but only to a *felonious taking.* By that statute the
owner of stolen property was entitled to restitution upon the
conviction of the felon. But as that statute did not apply
to a fraudulent obtaining of goods, the owner was not enti-
tled to restitution—and the question was then, say our su-
preme court in commenting upon that case, purely at common
law, and the innocent pawnee was allowed to recover against

the owner. Although in the statement of that case it is said that it does not appear by what means the defendant obtained the possession of the goods, yet I think it is evident from the opinion of the court that the offender was prosecuted for the fraud and convicted : and that thereupon the court before whom he was tried, awarded restitution to the owner, and this view of the case becomes the more important, because the main question to which the attention of the king's bench seems to have been called, was whether the statute of 21 *Hen.* VIII. extended to the case of goods obtained by fraud, so that restitution might be awarded to the owner upon conviction ; for if it did not, then the defendant had no right to the possession, and it was still in the plaintiff to whom they had been pawned. For this reason it appears to me that the case is of little weight in settling the question on either side.

It is insisted by the plaintiffs in error, that the same principles should apply equally to the cases of property obtained by fraud or felony, so far as innocent parties are concerned, and that the statute merging the civil action in the felony only applies as between the felon and the original owner of the property, and not to third persons. The courts, however, in England and in this country, have thought they saw some reasonable distinction between those cases ; and that the doctrine relating to the fraudulent acquisition of property, was not applicable to the felonious taking of it. But recently, in the English court of common pleas, in the case of *Samplin* v. *Addy*, sheriff of Warwickshire, Chief Justice *Best* virtually held that no such distinction existed. Our supreme court in adverting to that case in *Mowry* v. *Walsh*, 8 *Cowen*, 240, think the opinion of Chief Justice Best, " certainly at variance with the settled principles of law." This shows at least, that there is a difference of opinion among sound lawyers on that point; and I must confess that it appears to my mind very difficult to draw a satisfactory distinction between the two cases; either the original owner should be entitled to his property in both, or an innocent vendee or party should be protected as well in the one instance as the other.

The other case cited by the chief justice, is that of *Andrew* v. *Dieterich*, 14 *Wendell*, 32, decided in 1835 ; and is the first case in which the question as to the felonious acquisition of property came directly before the court. It was an action of replevin. The facts were, that one Simmons purchased of the plaintiff a quantity of carpeting, for which he was to pay cash as soon as it was measured and the quantity ascertained ; it was sent to him ; after which, instead of paying for it, he absconded. Previous to absconding, he applied to the defendant who was an auctioneer of household furniture, to sell his furniture, and obtained on it an advance of $350, and gave the key of his house to the defendant. After the carpeting had been three weeks on the floor of the house, the defendant removed it and the other things to his auction room. The plaintiff demanded it, and the defendant refused to deliver it up unless his lien was discharged, upon which the suit was brought. Justice Oakley, of the superior court, on the trial, charged the jury that the defendant was entitled to a verdict, if they found there had been a complete delivery of the property by the plaintiff to Simmons ; and that when the defendant made the advance and took possession of it by way of pledge he was ignorant of any circumstances which ought to have put him on his guard as to the manner in which Simmons had obtained it from the plaintiff ; and that if they found such a delivery by the plaintiff to Simmons, the plaintiff could not recover on the ground that the property had been feloniously obtained. The jury found for the defendant. By this charge, the law was given to the jury, and they passed upon it, as it had been understood to have been settled by the previous decisions. But the cause having been brought to the supreme court, on exceptions taken to the judge's charge, that court reversed the judgment on the ground that the goods were obtained under false pretences, which was made felony by statute. This was one of the first cases decided under that law for converting civil remedies into criminal prosecutions, the effect of which was to convict a man of a felony in the eye of the world in a civil action, to which he was not a party, and where he had no op-

portunity of making his defence. The extention of this questionable policy so much at variance with the common law which holds every man innocent until legally convicted, shows the necessity of coming back to the principle of the English courts, and of requiring a conviction of the offender before the prosecution of these civil remedies should be permitted, much less encouraged. In giving their opinion, the supreme court to some extent affirm the law as it was before held, and say that " a fraudulent purchaser acquires no title as against the seller, but as possession is *prima facie* evidence of property, where the vendor has delivered possession of his goods with intent not only that the possession, but the property shall pass, a *bona fide* purchaser from a fraudulent vendee shall hold the goods in preference to the owner." With all due deference to the opinion of the able judges of that court, I have understood the law to be a little different from that by them stated ; that as between the original owner of the goods, and a subsequent *bona fide* purchaser from a fraudulent vendee, it is not made a question whether the owner delivered the goods with the intent that the possession or the property should pass ; and that in cases where the delivery was merely conditional as between the original parties to the contract, as where the payment is to be made simultaneously with the delivery, but is omitted or evaded by the purchaser on obtaining the delivery of the goods, although there the delivery is merely conditional, and the non-payment is an act of fraud entering into the original agreement, and rendering the whole contract void as between the buyer and the seller, yet as to a subsequent innocent purchaser from that vendee, it is not so ; for if the owner indiscreetly parts with the possession to the vendee, he cannot afterwards reclaim the goods to the prejudice of the rights of subsequent *bona fide* purchasers or creditors of his debtor ; for where one or the other of innocent persons must suffer, the law imposes the penalty upon him by whose fault the necessity exists.

An *auctioneer,* does not claim the goods as his own, or assume any right in or over or to dispose of the same as his

Hoffman v. Carow.

own property. It is true he has a special interest in goods sent to him to be sold, and a lien on them, or their proceeds, for the charges of sale, his commission, and the auction duty payable to the state ; he may sue the buyer for the purchase money ; and is responsible to the vendee for the fulfillment of the contract of sale unless he discloses the name of his principal at the time of sale ; yet, for all other purposes, he is the *mere agent* for the transmission of goods from one set of traders to another. It appears to me unjust to charge him with the value of the goods sold in a case like the present; though I admit that if he had received notice that the property he was about to sell did not belong to his principal, and notwithstanding such notice he proceeded to sell, he ought to be held responsible to the real owner for the value of the property, or the amount of sales, as such owner might elect. In criminal cases it is the *scienter*, or *the intent*, which constitutes the crime ; and can it be just or equitable in a civil action to place an innocent man, an agent, one who is admitted to have acted without knowledge or evil intent, in a worse situation than one who is arraigned for a criminal violation of the laws of his country ? And to excuse the one from punishment if he has unwittingly or unintentionally violated those laws ; and at the same time to mulct in damages the other for a technical illegal taking of another's property. It is not the fact that the law regards the intent only in strictly criminal cases, for the question of *fraud* at the common law depends upon the motive. So if a person buys goods of another against whom he knows there is a judgment, and does not do it to defeat a creditor's execution, it will not affect his purchase.

All the cited cases, and which I have previously examined, show that there was a *demand* made before suit brought. In this case, it is not pretended that before this suit was instituted there was any demand whatever made, the claimant resting alone upon the legal principle that the sale was a conversion. I am satisfied, however, that a formal demand should have been made on those auctioneers before this suit was brought; and that it should never be permitted that a person who comes innocently into the mere cus-

tody of property, without claiming any title to it in his own right, and who by virtue of a public office conferred upon him by the government of the country, acts merely as agent for the sale of that property, and is known as such to the world, should be held liable to respond in damages to the person who may afterwards prove to be the owner, without having at least the opportunity of settling with his adversary, or of paying the amount claimed without being charged with the additional penalty of the costs of a suit.

I am still further satisfied, even allowing for the sake of argument that such formal demand had been made, that the plaintiffs in error, under circumstances like those exhibited in the present case, should not be held liable; and the more especially so when the person who claims to be the owner, does not show that he has taken any pains, by advertisement or otherwise, to caution the community that the property in question has been feloniously taken from him; but permits them to receive it from the felon, and to pass it away to other hands, without the slightest intimation that the title does not accompany the possesion in that as in all other cases. What reason can there be, that the principle which the courts have with so much justice adopted with reference to stolen bills of exchange and promissory notes, should not be applied to other personal property, equally the subject of mercantile transactions? Why not here as in the cases of those evidences of debt, hold the claimant bound to exercise due diligence in given the public notice of his loss; and leave the fact of proper diligence on his side, and of due caution on that of the defendant, for a jury to determine from all the circumstances of the case? It is because in the case of bills of exchange and promissory notes, the endorsement passes the title? Then equally effective is the possession of goods to evidence the title in all cases, except where the courts have interposed, and held innocent parties liable because they had done that which they believed was legal and right; and had no means of knowing to the contrary but by that information.

It is also urged on the part of the plaintiffs in error, and with strong reason for its support, that although possession

Hoffman v. Carow.

may not always be conclusive evidence of property in merchandize, yet when merchandize is abroad in a foreign country, the exigency of commerce requires that possession should be considered as conclusive evidence of property in all cases, where the purchaser acts in good faith, and without notice that the goods do not belong to him who is in the possession of the same. This it would seem should be the rule, as the title of personal property passes by the delivery ; and in two thirds or even three fourths of all that is passed through the millions of hands both in this country and in Europe, no other mode of passing the title is used. The public interest demands that such a rule should be adopted, or public notice should be required in all cases of the loss by felony of personal property. Otherwise, I cannot divest my mind of the strong impression which it has received, that a blow will be struck at the commercial interests and prosperity of our state, the extent of the evil effects of which it will be difficult to conceive. All who are in the least acquainted with the commercial relations of our country know that they are very extensive and important both with England and France and other countries, amounting to many millions of dollars in the course of a year. Suppose for an instance, that a man in either of those European countries should obtain goods by felony—for there are bad men all over the world—and consign them to a mercantile house in New York, one of the most respectable firms in that city, with directions to sell on his account and remit him the proceeds ; and they, without any knowledge of the manner in which the goods have been obtained, receive and dispose of the same, and remit the avails as directed ; and that some months after comes another person and claims those goods as his property, and in order to be parallel with the case under advisement, without saying a syllable to those merchants in New York, and without ever having given any notice to the world of his loss, he commences an action of trover against them. Would this or any other court hold them liable in that action ? or would not a sense of justice and equity revolt at such a proposition ? If such an action should be sustained, and a recovery had

against such firm under such circumstances, no mercantile commission house could thereafter exist in the city of New-York. *Baltimore*, so far as this question is affected, is a foreign city, and the state of Maryland a *foreign state*. The several states of the union, it is true, have confederated for their mutual safety and good government, but in all matters which relate to their internal police, legislative and judicial, they are as much foreign to each other as if situated on either side of the Atlantic; and therefore, in determining this important question, it should be done with a reference to the effect it is to have upon our foreign commercial relations. As I have before remarked, there has been no case, like the present, judicially determined by this court. *Saltus v. Everett*, 20 *Wendell*, 267, was not the case of property sent to an agent to be disposed of, and the proceeds remitted, but was the case of property converted here by a principal, between which two cases there is, in my judgment, a wide distinction, and involves the same principle as that of *Everett v. Coffin*, 6 *Wendell*, 605.

Having thus passed through with such an examination as I have deemed it my duty to give this matter, I have to add that the rule, as attempted to be established on the part of the defendant in error, is in my opinion too broad. Although I admit that the government is bound to assist the rightful owner of property in recovering the possession of it when it has been unjustly or feloniously taken from him; yet I insist that this should not be at the expense of an innocent person, without some notice, and especially in the present case, where the defendant in error kept the offender in his employment, in which he was at the time of the felony, although he had no charge of the goods; that, however, only serves to free him from a breach of trust, and is introduced for the purpose of showing it was a felony. The principle applies here with great force, that where one of two innocent parties must suffer, the law will impose the penalty upon him by whose fault the necessity exists. The defendant in error kept the felon in his employment, placed confidence in him, and the strong probability is that but for the facilities which his employment in that store afforded him, the felony would never have been committed. At the

Hoffman v. Carow.

civil law, when things were damaged or stolen by any of the servants belonging to a ship or an inn, the master of the ship or inn was held liable to pay double the value of the goods so damaged or stolen to the person sustaining the loss; but when the damage or theft was done by a stranger, or by persons unknown, the master was simply obliged to make good the loss. The reason for this important distinction is very evident. The master had in the first instance placed those servants there, and reposed confidence in them, which was a voluntary act on his part, and he should therefore answer for the wrong he had done the community by employing improper persons, as, in most cases, the exercise of an ordinary degree of caution would have enabled him to have become acquainted with the character and habits of his employees; but in the second instance, the master had not employed the person who committed the injury, or at least the fact that he had done so could not legally be brought home to him, still as the goods had been deposited with him, they should be forthcoming, or he should pay their value, but no damages as in the first instance for the wrong he had done society by keeping about him untrustworthy servants. The application of this principle to the case in hand may be made with much facility and correctness. Although I fully assent to the legal propositions, that no title passes where a felon sells stolen goods even to an innocent purchaser, and that the owner is entitled to take his goods wherever he can find them, yet I can by no means assent to the inference sought to be drawn from those propositions: that an innocent agent who is not a purchaser, who claims no title to the goods in himself but merely acts as a public auctioneer in disposing of them at public and open sale, and under a public notice that he will do so—who has paid over the proceeds of that sale, and delivered the property to the vendees before any notice or knowledge of the felony, and without any facts or circumstances to put him on his guard, and without any previous demand having been made upon him—is liable in an action for the value thereof to the owner. For these several reasons, I think the judgment of the supreme court should be reversed.

Hoffman v. Carow.

By Senator VERPLANCK.   The decision of this court last
year, in the case of *Saltus* v. *Everett*, 20 *Wendell*, 267, ac-
knowledged and confirmed the principle, that the owner of
personal property cannot be divested of his rights, unless by
his own act or his own assent; and that it is no defence
against such superior and original title for a subsequent pos-
sessor, that he honestly purchased the goods in the course
of trade from a person not authorized to sell them, though
otherwise in lawful possession.   In applying this doctrine to
the present case, the following questions arise:  The plain-
tiff below seeks to recover the value of his goods, not from
one having them in possession and refusing to deliver them,
or from one who sold for his own benefit, or otherwise con-
verted them to his own use, but from auctioneers who re-
ceived the goods without knowledge that they had been
stolen, sold them and transmitted the proceeds to their
supposed owner, who was in fact the felonious taker of the
property.   Are these innocent sellers liable to the true own-
er for the amount of his loss—or must his remedy be limited
to following the goods themselves, and recovering them or
their value from the person actually in possession under a de-
fective title?

The principle of the decision in *Saltus* v. *Everett*, and of
the authorities on which it rests, apply with equal force to
the present case.   The policy of our law is to make every
man look to the character of those with whom he deals,
and who are responsible for the title of property in the arti-
cles bought and sold.   If he does not do this, he must take
the consequent risk.   The same considerations of public
policy apply to him who sells as the agent of another, as to
him who buys; both of them are to look to the character of
the person with whom they deal.   If in this they are negli-
gent, or have been deceived, they must take the consequen-
ces whenever their rights come into conflict with those of
any innocent sufferer by the act of the same guilty third
party.   Accordingly the doctrine of our decisions is, that
the original and true owner of moveable property, who has
not by his own act or assent given a color of title or an ap-
parent right of sale to another, may recover the value of

those goods from any one having them in possession and refusing to deliver them up, or who has applied them to his own use, or has in any other way *converted* them, *i. e.* has changed the substance of the things in question, their character, use or ownership, to the injury of the real owner. The ground of the action used for the purpose is not the actual possession of the moveables, but some wrongful act relating to them : a tortious refusal to deliver them, a tortious taking, or else their wrongful *conversion ;* which last is presumed upon the refusal to give them up, and which is proved by a sale without authority. According to Lord Coke, in the oldest leading case on this head, which still preserves its authority, *Isaac* v. *Clark,* 1 *Bulst.* 312, " there must be an act done to convert one thing into another," and a converting into money by sale has always been held to be within this definition. The very recent English case, *Peer* v. *Humphrey,* 2 *Ald. & Ell.* 590, recognizes this same doctrine.

In the argument before us, it was very strongly urged that a rule of law, thus charging mere agents, would work great public injury as well as private injustice ; as it would extend to common carriers, ship masters and others, through whose hands goods feloniously or wrongfully obtained might pass. There may be some cases going to that length, but they are not, in my judgment, within the principle or the policy of the rule, nor are they included in the older decisions—as, for instance, in the one just cited from Bulstrode. I cannot think the law charges one who had accidentally a temporary possession of goods without claim of property, and with which he has parted before demand. It requires a wrongful taking or conversion of the thing itself to make the transaction tortious. The auctioneers who had sold the goods now in question have made such an unauthorized conversion, and must be answerable for the value. In this instance the rule falls hardly upon innocent and honorable men ; but looking to general considerations of legal policy, I cannot conceive a more salutary regulation than that of obliging the auctioneer to look well to the title of the goods which he sells, and in case of feloniously obtained property, to hold

him responsible to the buyer or the true owner, as the one or the other may happen to suffer. Were our law otherwise in this respect, it would afford a facility for the sale of stolen or feloniously obtained goods, which could be remedied in no way so effectually as by a statute regulating sales at auction, on the principles of the law as we now hold it.

II. It has been maintained with great ability that the rule thus stated, though admitted to be true as to goods *tortiously* obtained, does not apply to goods *feloniously* taken, and that damages for the conversion of such goods can be recovered only after conviction of the felon, and only from the person converting or refusing to deliver the goods *after* that time. In the present case, the felon was convicted, but the conversion and sale had taken place before the conviction. This ground was probably not taken before the supreme court, as it is not noticed in the opinion delivered in that court. I am not quite clear whether this may not be the existing law of England, and whether an action like the present could at any time be maintained there. By the ancient common law a person robbed could regain his property only by an *appeal* of larceny after conviction. The statute, 21 *Hen.* VIII, gave the party robbed a right to immediate restitution after conviction. Several decisions upon the act gave it a construction in conformity with the old law of appeal. It was strictly held that the civil action was merged in the felony. After conviction of the felon, the stolen goods could be reclaimed even if sold in *market overt*, and whoever sold them after that date was deemed a tortious converter. But it has been expressly decided that the owner who had prosecuted the thief to conviction, cannot recover the value of his goods from one who bought them from the thief, and sold them again before conviction, even with notice. 2 *T. R.* 750. In the words of Chief Justice Best, in another case, *Simpson* v. *Woodhert*, 2 *Carr. & Payne*, 41, " The law is this : you must do your duty to the public before you seek a benefit to yourself ; and then there is no necessity for a civil action. The decisions, says he, go not only to the case of an action against the felon, but also against persons who derive title under him. If

Hoffman v. Carow.

such actions could be maintained, there would be no criminal prosecutions." The authority of these and similar decisions has been much shaken, and certainly much narrowed in their application, by the case of *Peer* v. *Humphrey*, 2 *Ald, & Ellis*, 195, decided in 1835. There the court of king's bench held, that in trover for oxen feloniously sold by a servant, their value might be recovered from the *bona fide* purchaser who had sold them again before conviction. In this case the authority and reasoning of Lord Kenyon in 2 T. R. 750, were overruled by his successor, the present Chief Justice Denman.

But in my opinion, we are not called upon to reconcile these cases, or to decide between them, for whatever may be the law of England, it is quite clear that these peculiar exceptions to the general principle of the law, obtaining on special grounds of policy, have no application within this state. Not only has the foundation of the doctrine been removed by the abolition of *appeals of felony* and of the former statutory provision of restitution, but a contrary doctrine has been expressly substituted. The English law established the universal rule that the felony excluded or suspended the civil suit until after conviction. Our revised statutes enact thus, *part* 3, *ch.* 4 *tit.* 1 : " The right of any person injured by felony, shall not in any case be merged in such felony or be in any manner affected thereby." The first part of the section may, perhaps, by a strict construction, be confined to the action against the felon himself, which was formerly held to be merged in the felony ; but the concluding words have no force or effect unless they extend to cases like the present. Chief Justice Best, as just cited, says : " The decisions go not only to the case of an action against the felon, but also against persons claiming under him." As the action against the felon is restored by the first part of the section, so that against persons claiming under him must be comprehended under the final words : " the rights of any person injured by any felony, shall not be in any manner affected thereby." The abrogation of the whole policy of the English law on this head, removes the only exception before known to the general

right of the real owner to follow his property and recover its value in any hands whatever. But we need not rest merely on the general terms of this enactment. The whole policy of the statute of restitution upon which the English decisions stand, has been altered in our statute; Instead of requiring a conviction before stolen goods are restored, lest (as Hale and Blackstone says) " felonies should be made up and healed," our revised statutes direct that " upon receiving satisfactory proof of the title of any owner, the magistrate who shall take the examination of an accused person, may order the same to be delivered to such owner." And again : " If stolen property shall come into the custody of any magistrate, upon satisfactory proof of the title of any owner thereof, it shall be delivered to him." Finally, the English statute is in substance re-enacted, with this remarkable addition : " if the property shall not before have been delivered to the owner." These several provisions, taken in connection with the abolition of appeals of felony and of the merger of the civil remedy in the criminal prosecution, shew, I think, conclusively, that the English doctrine on this head, even in the more limited sense as laid down by Chief Justice Denman, has no application in this state.

If this view of the subject be correct, our own legislation here affords another instance of the gradually but increasing respect for the rights of original ownership against all other claims, (even that of an innocent and apparently lawful possessor,) which has marked the advance of civilized life. Chancellor Kent, 2 *Kent's Comm.* 320, has drawn a striking and philosophical outline of this advance. He has shewn how, in the earlier ages of the Roman, the German, and the English law, the rights of the first proprietor of things moveable, when divested of his possession, had little preference over that of any other possessor under color of right; and how the respect for the rights of property kept on increasing in efficacy with social improvement and the corresponding advance of the law, from rudeness to refinement.

III. It has also been urged before us that where merchandize is abroad in a foreign state, the necessities of

Hoffman v. Carow.

commerce require that possession shall be regarded as con-
clusive evidence of property in respect to a purchaser who
acts in good faith. It has also been argued that the cause
of action arising in *Maryland*, where the goods were sold,
the decision of this cause might be governed or modified by
the law of that state. The law of England, as well as that
of all those states where the common law forms the ground
work of the local jurisprudence, considers all personal ac-
tions, whether *ex contractu* or *ex delicto*, wherever the
cause of action arose, as transitory, and subject to the law
of the jurisdiction under which the parties are litigant.
It is a principle of the same law, pervading the jurispru-
dence of almost all civilized countries, that " moveables are
governed by the law of the domicil of the owner." Lord
Loughborough has stated the rule thus : " It is a clear prop-
osition that personal property has no locality," which para-
doxically sounding maxim he explains to mean, that person-
al property " is subject to the law which governs the per-
son of the owner, both in respect to its disposition and its
transmission." 2 *H. Black.* 690. Our American decisions
of inter-confederated law (if I may use the phrase,) fully sus-
tain this principle. In cases of foreign contracts, the law
of the place of contract is recognized as to the force and
effect of the contract is recognized as to the force and
ter into the consideration of the parties, to form a part of
the bargain, and to interpret its language and meaning. In
other respects, rights as to personal property are seldom
governed by the *lex rei sitæ*, or that of the jurisdiction where
it may accidentally be, whilst the owner dwells and the suit
is brought elsewhere. Now, this is not a case of contract,
but a question of ownership and conversion. The same
rule, therefore, must be applied to the sale of these goods in
*Baltimore*, as if they had been sold in *Albany*. There may
possibly be cases where the same reasons of justice and
policy which give authority in our courts to the foreign *lex
loci contractus* may give similar weight to the *lex rei sitæ*,
so as to make the foreign law of the temporary locality of
the moveables, vary that of the owner's domicil. The extent
or the limitations of such exceptions to the general law we

are not now called upon to decide. We have no evidence that the local law of Maryland differs as to this matter from our own. The naked fact, that the goods were sold in another state can have no effect to change or vary those rights of personal property which are prescribed by that which, in this case, is alike the law of the owner's domicil, and of the jurisdiction in which he asserts these rights. The judgment of the supreme court should be affirmed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows :

*In the affirmative—Senators* FURMAN, HAWKINS, HULL, MAYNARD, WORKS—5.

*In the negative*—The CHANCELLOR, and *Senators* CLARK, EDWARDS, HUNT, HUNTER, JONES, H. A. LIVINGSTON, NICHOLAS, PAIGE, PECK, POWERS, SKINNER, SPRAKER, STERLING, VERPLANCK, WAGER—16.

Whereupon the judgment of the supreme court was AFFIRMED.