McKinney, J.,
delivered the opinion of the Court.
This bill was brought to compel the surrender of a slave, named Frank, in the possession of the defendants, and claimed to be the property of complainant.
*709 The facts of the case are these: On the 9th day of December, 1854, the complainant made an exchange of slaves, with a stranger, calling himself James Yichouse, in Jackson county, Alabama, the residence of the complainant. The complainant received a slave named Sam, from Yichouse, who represented that he was the rightful owner of said slave; and gave in exchange for him to Yichouse, the boy, Frank, and' his note for $550 00 in money. The complainant executed to Yichouse a bill of sale for Frank, with the usual warranty of title, and delivered said boy, with the bill of sale, and his note for the hoot, into the possession of Yichouse, at the time of the exchange; and likewise received from Yic-house a bill of sale for the slave Sam. A few days after this exchange, to wit: on the 23d of December, 1854, Yichouse purchased a bill of goods from the defendants — who are dry goods merchants in Nashville— amounting to the sum of $650 68, for which he executed to them his note, due one day from date; and to secure the payment thereof, delivered into their possession the boy Frank, by way of pledge.
On the 9th of February, 1855, the complainant paid to Yichouse the sum of $160 00, in part discharge of the note given to him on the exchange of the slaves.
On the 15th of February, 1855, Yichouse wrote to the defendants, from Chattanooga, Tenn., informing them that, owing to misfortune, he was unable to lift the note given to them; and requesting them to sell the boy Frank, pledged to them as security for its payment, for whatever he could be sold for; and to retain the amount of the note out of the proceeds; and pay the balance, if any, to his order.
*710 About the 6th of March, 1855, the slave Sam was demanded from the complainant, by the agent of Stephen G. Smith, a citizen of Georgia, from whose possession said slave had been feloniously taken, by Vic-house, in the latter part of November, 1854; and upon satisfactory proof that the slave was the property of Smith, and that he had been stolen from him, by Vic-house, the complainant delivered up the slave to Smith. The complainant, upon ascertaining from Vichouse, who was then confined in jail at Atlanta, Georgia, that the boy Frank was in possession of the defendants, came to Nashville, and demanded the boy as his property; which being refused, he filed this bill, on the 13th of March, 1855, to compel his surrender. On the day preceding the filing of the bill, the defendants had sued out an attachment, at law, against Vichouse, and had caused the same to be levied on the slave Frank, to enforce the payment of the note due to them, which still remained unpaid, and for the security of which the slave had been pledged.
It is conceded, that the complainant and defendants acted equally in good faith, in their respective transactions with Vichouse; and that they were alike ignorant and unsuspecting of any defect in his title to either slave.
The Chancellor, upon the foregoing facts, decreed for the complainant, and the defendants appealed.
It is argued for the complainant, with great plausibility, that the decree is correct, both upon principle and authority. The argument, in substance is, that, by a general rule of the common law, a purchaser out of market overt, cannot acquire a better title to property *711 than Ris vendor was invested with; according to tRe maxim tRat one man cannot convey to anotRer a rigRt of property which Re does not Rimself possess; and tRat a sale of property, ex vi termini, imports notRing more tRan tRat tRe Iona fide pnrcRaser succeeds to tRe rigRts of tRe vendor. 2 Kent’s Com., 824. . And tRat, as tRe EnglisR custom of markets overt does not obtain in this country, tRe possession of goods or cRattels, procured by felony, or by fraud, does not alter tRe rigRt of property; and tRe rigRtful owner may' pursue tRem, not only into tRe Rands of tRe felon, or fraudulent possessor, but likewise into tRe Rands of a bona fide pur-cRaser from eitRer.
TRis argument would seem, at first view, to be sustained by general statements in some of tke elementary books, and also in reported cases. Mr. Kent says, (2 Kent’s Com., 324,) ‘‘it is said to be- a general rule, tRat goods obtained by tort, or criminal fraud, under color of a contract, may be taken by tRe vendor out of tRe hands of the purchaser, or even of a purchaser from the tortious vendee.” And in Templin vs. Addy, reported in a note to Mowry vs. Walsh, 8 Cowen’s N. Y. Rep., 238; Lord Ch. J. Best, at nisi prius, said, “ There is no principle of law more firmly established than this, that no property passes by a fraud;” and that, as to goods “ thus, obtained, the right remained in the original owner, no matter into whose Rands they found their way.” Other cases which seem to favor the same general doctrine, might be cited. But upon a careful examination of the authorities, it will be found, that such is not the law; and that the *712 conflict of judicial opinion upon this subject is, perhaps, more apparent than real.
In the first place, there is a broad and well-settled distinction between the cases of a possession of goods acquired by felony, and by fraud. It is admitted on all hands, that where goods were stolen, no title passed from the owner, unless they had been fairly sold in market overt. Such was the rule of the common law. And, as we have no such markets in this State, it follows that a sale of the stolen goods, or any number of sales, can have no effect upon the title of the proper owner; no matter how innocent the purchaser may have been of any participation in, or knowledge of, the felony.
But, in regard to the possession of goods obtained by fraud, under color of a contract, authenticated in the mode required by law, the consequences are very different, so far as respects purchasers from the fraudulent vendee.
As between the immediate parties themselves — the vendor and the fraudulent vendee — the contract may, indeed, be avoided by reason of the fraud; and upon demand to have the goods delivered back, the vendor will be re-vested with the title, and may recover the goods from the pretended purchaser, or any one to whom he may have sold them, with knowledge of the fraud. But if the fraudulent vendee has re-sold them to a bona fide purchaser, before the vendor has signified his dissent from the contract, or interposed to regain the possession, the title of such bona fide purchaser cannot be defeated. Addison on Contracts, 216.
A bill of sale of goods and chattels, or an ordinary *713 contract of sale, duly authenticated, operates as a direct transfer of the ownership and right of property in the thing sold, to the purchaser j and where the actual possession has been delivered to the purchaser, in fulfilment of the contract, the right of the vendor over the property is gone, and he cannot reclaim the goods, except on the ground that the contract is vitiated by fraud. This right, however, can only be asserted, as we have seen, against the vendee and those claiming under him, who stand equally affected by the fraud. But a bona fide purchaser cannot be affected by the fraud. The vendor will not be heard to question the validity of a title fairly acquired, in the ordinary' course of dealing, from one, who, by the vendor’s, own act, was not only vested with the actual possession of the goods, but clothed with a title prima facie valid.
It is enough for the protection of a bona fide purchaser, that the owner of the property confers an apparent right of property upon the person who acquires the possession from him. 20 Wend., 267. If the vendor delivers goods, with the intention that the property as well as the possession shall pass, .a bona fide purchaser from his fraudulent vendee, will hold the goods. 14 Wend., 31.
This is necessarily the result, upon .the maxim, that where one of two innocent persons must suffer a loss, the law will cast it upon him by whose act it was occasioned. The original owner of the property, and a bona fide purchaser from his fraudulent vendee, are not, however, equally blameless in the eye of, the law. The latter stands upon the vantage ground of having, without the imputation of fault or negligence, acquired the pos *714 session from one who was clothed with all the external indicia of rightful ownership; and prima facie, had the right to sell. It cannot he questioned, that notwithstanding the fraud, the title passed to the vendee, and remained vested in him, until the vendor expressed his dissent, and took steps to avoid the contract and reclaim the property. But all that can be said for the vendor in such a case, is, that he was unwittingly circumvented, and improvidently parted' with his property; a statement- which implies the want of proper vigilance on his part. See also 8 Cowen’s R., 238; 22 Wend., 285.
The same doctrine applies where the goods have been pledged. The author above cited, (Addison on Con.,) at page 318, lays it down, that if a man obtains goods under color of a contract intended to transfer the property in the goods to him, and then pledges them, the pledgee will have a lien upon the goods to the amount of his advance. As, for example, if a man purchases' and obtains possession of a specific chattel, and pays for it by a fictitious bill of exchange, or by a check on a banker where he has no funds; and then pledges the article with a party who advances money upon it, without any knowledge of the fraud, the pledgee will have a lien for his advances against the vendor who has been defrauded. But if the article has been stolen, and then pledged, the pledgee will have no lien upon it, as against the owner.
The case of Parker vs. Patrick, 5 Term Rep., is directly in point. In that case, goods had been fraudulently obtained from the defendant, and pledged to the plaintiff for a reasonable consideration, without notice to *715 the plaintiff of the fraud. The defendant, by some means, afterwards regained the possession; and it was insisted that the plaintiff, though an innocent pledgee, could not recover, because he had derived his title through the party to the fraud, and was upon the same footing with one who derived title through a felon. But Lord Kenyon thought the cases were different, and the plaintiff had a verdict. Most of the authorities to which we have been referred by the complainant’s counsel, séem not to be in opposition to this doctrine, when carefully examined. The case of Hartop vs. Hoare, 3 Atkyns, 44, was simply a case of naked bailment of goods, to the bailor’s own use; there was no authority whatever given to the bailee to dispose of them; and all the cases agree that his wrongful disposal of them was a conversion; and that the bailor was entitled to recover them. It was so held; and could not have been held otherwise. The case of Tamplin vs. Addy, before referred to, is more equivocal. . In that case, goods were fraudulently purchased from the plaintiff, by Staunton; and after delivery to him, they were seized and sold by the sheriff, under execution against him. In delivering the judgment, Lord Ch. J. Best states the broad proposition before noticed. If understood with reference to the particular facts of the case in judgment, the proposition is not so objectionable. In the case of a purchaser at execution sale, the doctrine of caveat emptor applies. He buys at his peril; and occupies the attitude of a mere assignee, by operation of law; nothing is taken in his favor, and he must stand upon strict law. If, in this view, the decision cannot be supported — and we are not prepared to admit that it *716 can — it is clearly opposed to the well settled principles of law applicable to this subject.
We have not been able to procure the authority to which Mr. Kent refers, for the general proposition stated by him, as cited above. Upon examination, it will, perhaps, be found that the proposition has been stated without the qualifications properly belonging to this doctrine.
Secondly. We hold that a verbal pledge of a slave is valid by the law of this State, as it stands at present. As regards an absolute sale, or mortgage, of a slave, a writing, proved and registered, is required by the letter of the act of 1831, ch. 90. But this statute has no application to a mere pledge, by which the general property does not pass, but remains in the pledgor.
Thirdly. We are of opinion that the defendants’ lien, as pledgees of the slave, was not waived, or in any manner prejudiced by their causing an attachment to be levied on the slave, under the circumstances of this case. It is certainly true, that the voluntary surrender of the possession of the pledge, with an intention to abandon the lien, terminates the right of the pledgee. So, if the pledgee voluntarily, by his own act, places the pledge beyond his own power to restore it, as by agreeing that it may be attached at the suit of a third person, that will amount to a waiver of the pledge. Story on Bailments, sec. 299. And in one case it seems to have been held, that if the pledgee causes the thing pledged to be attached, in a personal suit against the pledgor, for the same debt for which the pledge was given, his lien is thereby waived. Ibid, *717 sec. 366. In this conclusion we do not concur, as respects the case under consideration.
It may be admitted that, aside from the authority to sell, contained in the letter of Yichouse, the defendants, as pledgees, might have sold, after default in payment, and reasonable notice to the pledgor, without the aid of a judicial sentence or decree. But the pledgee has an election, as to the mode of sale. He may file a bill in equity, for a foreclosure and sale; and this course is necessary in order to destroy the right of redemption, which would still continue to exist, in case of a sale by the mere act of the party. Ibid, secs. 308-310.
The attachment was not the regular method of proceeding ; but, as the object was to enforce a sale of the pledge, for the satisfaction -of the debt, we are at a loss to see how such proceeding can be regarded as evidence of an intention to waive' the lien.
The decree will be reversed, and the bill be dis missed.