Newton *v.* Porter.

---

ELIZABETH S. NEWTON, Appellant, *v.* OLIVER PORTER, HARRIS C. MINER, WILLIAM H. WARREN et al., Respondents.

(GENERAL TERM, THIRD DEPARTMENT, MARCH, 1872.)

Where attorneys-at-law received notes and a mortgage of real estate from parties who had taken them as security for the loan of moneys realized upon sale of bonds which they had stolen, and so received them as indemnity for legal services in defending the assignees in civil and criminal proceedings growing out of the larceny,—*Held*, that they were liable to the owners of the bonds for the proceeds of the securities received, beyond the value of services rendered previously to notice of the fact that the notes and mortgage represented moneys realized from the stolen bonds·

Newton v. Porter.

THIS is an appeal from a judgment entered upon the findings and decision of one of the justices of this court, in an action tried before him at Special Term, without a jury. None of the evidence is set forth in the case, both parties acquiescing in the findings of facts by the judge, which are, in substance, as follows: One Elizabeth Newton, of Homer, Cortland county, was, in November, 1868, the owner of government and other bonds to the amount of $14,000, and she died on the 16th of that month, leaving the plaintiff in this action her only child and heir-at-law, who, with her husband, Charles O. Newton, were appointed her administratrix and administrator.

These bonds came to the personal care, custody and control of the plaintiff, and were treated as her property, though no transfer in form had been made, nor had any settlement been made of the estate of the deceased.

In March, 1869, these bonds were stolen from the plaintiff by one George Warner, whose wife, Cordelia, took them to William E. Warner, the brother of her husband, living at Newark, Wayne county. William, knowing them to be stolen, three days afterward, took them and delivered them to one Alfred D. Lusk (another of the defendants), for the purpose of having them sold. Lusk, knowing them to be stolen, soon after, with the consent of the two Warners, George and William, sold and converted them into money, except about $2,500 of them, which he at first hid, but afterward restored to plaintiff. Lusk realized on the sale about $12,600, which he divided into three parts, giving one-third to George and one-third to William E. Warner, and kept one-third himself; $1,000 of this, Lusk subsequently restored to plaintiff; the remainder, $3,200, he has kept.

It does not appear in the findings what disposition George Warner made of his portion, except of $1,963. William E. Warner loaned out his division of the stolen proceeds, in notes and obligations, to various individuals, who are named, generally in small amounts. This $1,963 George let to one Dan. K. Low, father of his wife, with which sum said Low took the assign

ment of a mortgage, and, in December, 1869, Low assigned this mortgage to Cordelia Warner (one of the defendants), the wife of George, without consideration received. Cordelia Warner, by an assignment, on the 27th January, 1870, transferred this mortgage to Oliver Porter (one of the defendants), though the assignment was antedated, as of the date of January 11th, 1870. This last assignment was made under the agreement between Porter and Cordelia, that Porter should hold it as a security to enable him to procure bail for her husband, George, who was then arrested on the charge of stealing the bonds of the plaintiff, and also for Cordelia, arrested on a like charge; and that out of 'the funds to be collected thereon, the said Porter, who is an attorney and counselor-at-law, was to be paid his costs and disbursements, and counsel fees for defending George and Cordelia on said charges, in all the courts wherein they might need assistance; and also for defending a civil action that the plaintiff had brought against them and others, in regard to the avails of said bonds. Porter received full payment on the bond and mortgage, amounting, with interest, after deducting fifty dollars for expenses and costs of the assignment, to $2,085.65.

Before the day on which Porter took this assignment, which was 27th January, 1870, he had notice that it was purchased with money, the avails of the said stolen bonds, though his negotiation in relation to the taking of it was on the 11th of January, at which time he had no notice.

On the 19th of January, 1870, Porter also received from one A. R. Warren a note against one Knapp of $150, which was given for money loaned by Wm. E. Warner from the proceeds of these bonds. Porter received this note for the same purpose as the mortgage, but without notice, at the time he took it, that the same was taken from the avails of the bonds, but the note was past due.

Out of the moneys received by Porter on the bond and mortgage, he deposited $1,000 in the First National Bank of Cortland (also one of the defendants), where

Newton v. Porter.

it was received in the ordinary course of business, without any notice by the bank of the source from whence it came. This $1,000 Porter deposited to the credit of Thomas Keaton (another defendant), president of said bank, who then gave a check on said bank to Porter of $1,000, payable to Porter's order. Porter then procured one Daniel Sperry (another defendant) to become bail in the sum of $1,000 for the appearance of Cordelia, she having then been indicted for stealing, or being accessory to the stealing of said bonds; and he indorsed over the said $1,000 check to Sperry, which Sperry took, and now holds as security in good faith, without notice of the source from whence it came.

The defendants, William H. Warren and Harris C. Miner, were also attorneys and counselors-at-law, and were also employed to defend the said George and Cordelia in the criminal and civil actions, and they received from William E. Warner various notes and obligations as security in good faith without notice of any defence thereto (except two notes of Haight and Lusk, amounting to about $206, which were past due).

On the 24th of January, 1870, Porter, Miner and Warren received notice from what source the notes and mortgage arose. After that date, and with that notice, Miner and Warren divided the notes they had taken between them; Warren realizing $1,459. This included the overdue notes of Haight and Lusk; and Miner received $1,316.65.

About the 20th of January, 1870, William E., George and Cordelia Warner employed Porter, Miner and Warren as counsel to defend them in said matter, and they, P., M. and W., were to employ another counsel to assist them, and pay him; and, in consideration of this undertaking, William E. Warner agreed to turn out to Miner and Warren the notes aforesaid, which he gave them directions to go and get, and which they, afterward, received; and it was also agreed that out of what Miner and Warren received on the notes, they were to pay themselves and Porter whatever costs, disbursements and counsel fees they incurred, or became liable

for, in defending William E. Warner, or any of the family, in the litigation arising out of the alleged bond robbery, and if there should be any surplus, they should pay that back to William.

Charles O. Newton, one of the plaintiffs, with the assent of his wife, made criminal complaints against William, George and Cordelia Warner, and Alfred Lusk, for stealing, and receiving and selling the said bonds; and indictments were found against them, and George has been tried, convicted and sent to State prison.

On the 5th of April, 1870, William E. Warner assigned to plaintiff all the notes, etc., he had delivered to Miner and Warren, which assignment was accepted.

On the 21st of January, 1870, plaintiff commenced a civil action against the Warners, Lusk and others, to recover the value of said bonds, and asked for an injunction to restrain them from disposing of the same. A verified copy of this complaint came to the hands of Porter, Miner and Warren, on or before the 24th day of January, 1870; and also a copy of the evidence that had been taken, on the examination before the magistrate of William, George and Cordelia Warner, as to the source from which the aforesaid securities came.

It is then found that the value of the services of each of the said counsel, Porter, Miner and Warren, including disbursements and liabilities, was $269; that, deducting these sums, would leave in the hands of Warren $1,085.82, and in the hands of Miner $1,130.28. Upon this state of facts, the judge finds as follows:

"My conclusions of law are, that, except as to the mortgage, and the two Haight and Lusk notes, the defendants Porter, Miner and Warren received those notes for a valuable consideration and in good faith.

"That they are entitled to be paid, out of the notes thus received, their disbursements and services performed, and liabilities created by them (as a consideration for the notes), before the 24th day of January, 1870, when the action was commenced by plaintiff against Lusk and others. As to

what was by them paid out and services performed and liabilities created after that time, they were not holders or receivers of such property in good faith, and were not entitled to be paid.   But these bonds having been stolen and sold by the felons, and the moneys arising therefrom invested, no trust is created or can be implied as to the securities taken therefor, in the hands of the defendants Porter, Warren, Miner, Thomas Keator, The First National Bank of Cortland, or Sperry, for the benefit or in favor of this plaintiff.   Therefore, no cause of action is established against them; that the complaint should be dismissed as to Porter, Warren and Miner, with costs.   The other of said defendants having been served with notice that no personal claim was made against them, the complaint should be dismissed as to them without costs.

"The defendants, George Warner, Cordelia Warner and Dan. K. Low, have not defended, but, as a prior action has been tried and decided as to them of the same nature, it would be improper to order judgment against them in this case.   It is therefore dismissed as to them without costs; that the injunctions granted in this action should be dissolved."

*C. B. Sedgwick*, for the appellant.

*Oliver Porter*, for the respondent.

Present—MILLER, P. J., POTTER and BALCOM, JJ.

POTTER, J.   With great deference and respect for the learned judge who found the facts in this case, I am compelled to differ with him totally in his legal conclusions.   It would be, in my opinion, a most lamentable proposition to adopt, into either the legal or equitable jurisprudence of this country, that, by established principles of law, the thief can be protected from legal liability to the owner of property from whom he has stolen it, while one who has obtained it by only a misdemeanor or a fraud can be held liable.   This, as I understand

the conclusions of law found in the case, is the ground upon which the case was decided; and this, upon the exploded idea "that the bonds having been stolen and sold by the felons, and the moneys arising therefrom invested, no trust is created or can be implied as to the securities taken therefor in the hands of those who hold such securities with knowledge of the larceny and its avails." I shall not yield my judicial opinion to such a view until overruled by a higher tribunal, and shall, even in that contingency, still protest that such a holding would be a reproach upon the administration of the law. I do not, by this, mean to say that the learned judge intended to lay down, as a legal proposition, what may be implied from my remarks. He was, doubtless, looking to the *form*, rather than to the *principle;* but, in that view, I think he was also mistaken. Even regarding the possession of the property as a trust, I hold the law to be, that, wherever the circumstances of a transaction are such that the person who takes an estate in property cannot enjoy the beneficial interest without necessarily violating some established principle of justice and equity and good morals, the court will immediately raise a constructive trust, and fasten it on the conscience of the possessor, and convert him into a trustee for the true owner. In all such cases, courts of equity have adopted principles extremely broad and comprehensive in the application of remedial justice. They will interfere, not only to administer wholesome justice, but even stern justice, in favor of innocent persons who are sufferers by it without any fault on their side. And this is readily done, by converting the offending party into a trustee, and making the property so held subservient to the proper purposes of recompense by way of equitable trust. But, really, no question of trust arises in the case. This case, below, was undoubtedly decided under the belief that there was, first, a trust, and, second, that there was a distinction between the principles that should apply, between cases of property obtained by fraud, and those of cases where it was obtained by felony; that, in the former, equity furnished a remedy, and that, in the latter, it did not,

for the reason that the felony merged the civil action in the felony. Such a doctrine can be found in some of the old English cases, applying to certain conditions, circumstances, and the existence of institutions, known in England, but not known in this country; and though there are cases to be found here, which seem to suppose it to be the common law, it never was adopted in this State. Perhaps it was because its adoption was regarded as being left in doubt, that, as long ago as 1801, the legislature of this State expressly enacted that persons who should be aggrieved by any felony might maintain his or her action in like manner as if it had not been committed feloniously; and in no case should the right of action be merged in the felony, or in any manner affected thereby. (Sess. Laws, 1801, Greenleaf's ed., chap. 60, § 19, p. 264.) This statute has been in force ever since, and is now a part of the Revised Statutes. (Vol. 2, p. 292, § 2.)

Ever since the decision of the celebrated case of *Hoffman* v. *Carow*, in the Court of Errors of this State, reported in 22 Wendell, 285, the question has been put at rest. In that case it was held that even an auctioneer who sells stolen goods is liable to the true owner, notwithstanding that the goods had been sold by him, and the money paid over to the thief, without notice of the felony. The note to that case shows the foundation of the claim or pretence, that there having been a felony makes any difference in the right to recover. The owner of stolen property, or the avails thereof, clearly traced and proved, can recover it by any proper action, in any proper form, in whose hands soever it may be found; and no law is to be found that throws around the thief its technical protection to shield him. We have no such ungracious doctrine incorporated into our jurisprudence.

Two well-established principles, or maxims of law, would prevent the adoption of the rule claimed by the defendant. First, that the wrong-doer shall never be heard in court to claim that his felony, or other wrong, gives him any advantage as a defence (Broom's Maxims, 317, 318; Co. Litt., 148, *b*); and, second, that the owner of property is not divested

of his title by a larceny of it, and that the purchaser or par-taker of the stolen property obtains no better title than his vendor had (except in the case of commercial paper purchased before it becomes due, and in good faith). In all other cases the doctrine of *caveat emptor* applies. The principle rests in common law, and in common sense, that a felon does not acquire any title to goods stolen, and he cannot, therefore, transfer any title, even to a *bona fide* purchaser, except as above mentioned. It would be monstrous, indeed, if our law was such that, when the felon is expert enough to place his unrighteous gains in the hands of another person, they cannot be followed and obtained, and this because the holder cannot be regarded as a trustee!

The recent case of *Bassett* v. *Spofford*, reported in 45 New York, 387, &c., decided since the trial of the case before us, is conclusive upon the point we have been discussing, and covers it to the fullest extent. The owner is not estopped, in any way, from pursuing his remedy.

No point is raised, in the case before us, that the complaint is not broad enough, or that the facts found are not sufficient to sustain it, if, upon them, the plaintiff is entitled to relief. I think she is clearly entitled to judgment upon those facts.

It was always allowed in equity, even upon the other view of the case, that, where trust money has been converted into land, stocks, notes, &c., that the substitute may be claimed, when it can be identified by evidence. (*Leuck* v. *Leuck*, 10 Vez., 517.) In the case of *Taylor* v. *Plummer* (3 M. & S., 562), a broker, who was entrusted with money to buy exchequer bills, misapplied it by buying American stock and bullion with intent to abscond, the principal was allowed to take the bullion and proceeds of what was transferred, even against the assignees of the broker, who had become bankrupt on the day he received the money. In the case of *Lane* v. *Dighton*, reported in Ambler, 409, Lord HARDWICKE, chancel-lor, said, in a case where a trustee had used trust funds in the purchase of lands: " The court has been very cautious in fol-lowing money into land, but it has done it in some cases."

Newton *v.* Porter.

The difficulty is in the proof. "No one will say but the court would, if it was actually proved that the money was laid out in land." So the same principle was followed in *Silsbury* v. *McCoon* (3 N. Y., 379), where it was held that a willful wrong-doer can acquire no property in the goods of another by any change wrought in them. And it is only where, if a chattel be converted by an innocent purchaser or holder into a different species, as where wheat is made into bread, olives into oil, or grapes into wine, that it cannot be reclaimed by the owner; but if the willful trespasser himself make the change, as corn into whiskey, it can be followed; and if the wrong-doer sells the article taken to an honest purchaser, having no notice of the fraud by which it was acquired, the purchaser in such case obtains no title from the trespasser, because the trespasser had nothing to give.

I do not mean by what I have said, to hold that the receiver or purchaser of stolen property or its avails cannot be treated as a trustee for the true owner. If a case is presented in which that should be the only or the best condition of liability to impose upon the possessor, I think the law of equity in such a case would cast that character upon him. It is its boast that it will allow no wrong to be without a remedy. (1 T. R., 512.) Nor will the law, on account of the remedy in such a case, allow itself, in its executive capacity, to work a wrong, if the court have jurisdiction of the matter. (2 Just., 482.)

In the case before us, it was the felons who changed the stolen bonds into money, and (as found by the judge) the same money was changed into mortgage and notes. There is no dispute about the following it and its identity, or of its conversion into the obligations in question. It was no *bona fide* purchaser that wrought this change; and some of these obligations came into the hands of the defendants, or some of them, with knowledge of the larceny. And the question before the court was, whether the proceeds of this stolen property could be recovered, by the plaintiffs, of the parties so holding it. The learned judge thought there was no trust,

and because there was no trust he dismissed the plaintiff's bill, with costs to them. This I think was clearly error. By every principle of natural equity and justice, the defendants were bound to hand over the moneys and obligations in their hands, which were the conceded avails of the stolen bonds. If they had any legal rights, by holding them for legal liabilities to them, or by reason of being *bona fide* purchasers, such rights should have been settled by the court below and declared. If they held to an amount which was in excess of such liabilities, such excess belonged to the plaintiffs.

I think the learned judge correctly held that for the services performed by the counsel, prior to the 24th of January, 1870, if payment therefor was taken out of notes not then due, and received in good faith, they were entitled to be paid out of such notes. I think he also corrrectly held that, for services performed after that time, they were not holders or receivers in good faith, and were not entitled to be paid; but I think he erred in dissolving the injunction, as well as in dismissing the complaint.

The judgment should be reversed, and a new trial ordered, costs to abide the event.

BALCOM, J. The defendant, George E. Warner, stole $14,000 worth of bonds from the plaintiff, and disposed of them for money; which money was lent, and promissory notes and an assignment of a mortgage on real estate were taken therefor. A portion of such notes and the real estate mortgage came to the hands and possession of the defendants, Porter, Miner and Warren, attorneys of this court, who engaged to defend Warner and his wife for the larceny in stealing the bonds, and to procure bail for one or both of them before their trials. Porter, Miner and Warren had knowledge or notice, as the case shows, either at the time they received the notes and mortgage, or soon thereafter, that they were given for, or were purchased with, money obtained for the bonds which Warner and his wife, or one of them, had stolen from the plaintiff.

Newton v. Porter.

The justice at the Special Term dismissed the plaintiff's complaint with costs.  After judgment was rendered against the plaintiff and for costs, she appealed therefrom to the General Term of this court.

The justice at the Special Term held that the plaintiff could not recover in this action the notes and mortgage that were given for, or were purchased with, money obtained for the bonds stolen by Warner and wife, or one of them, or the avails of such notes and mortgage, that had come into the possession and hands of the defendants, Porter, Miner and Warren, though they had knowledge or notice that such notes and mortgage were given for, or were purchased with, money received for the bonds stolen from the plaintiff, before they became holders of such notes and mortgage, for full value paid or incurred therefor; for the reason, that no trust (in the opinion of the justice) was created or could be implied as to the notes and mortgage in the hands and possession of Porter, Miner and Warren, in favor of the plaintiff.  It was upon that ground that Porter, Miner and Warren were allowed by the justice to keep the notes and mortgage that were given for, or were purchased with, money that was obtained for the bonds stolen from the plaintiff, together with the money those defendants had received on such notes and mortgage.

The defendants, Porter, Miner and Warren, have attempted to sustain the decision and judgment rendered at the Special Term by the following authorities, viz.: *Hawthorn* v. *Brown* (3 Sneed., 462), *Ensley* v. *Balentine* (4 Humph., 233), *Campbell* v. *Drake* (4 Iredell, 94), *Pascoag Bank* v. *Hunt* (3 Edw. Ch., 583), Perry on Trusts (102 and 103).  The plaintiff's counsel has cited many authorities on which he relies for a reversal of the decision and judgment of the Special Term, among which are *Hoffman* v. *Carow* (22 Wend., 285), *Bassett* v. *Spofford* (45 N. Y., 387), *Heckle* v. *Lurvey and wife* (3 Am. Rep., 366), Hill on Trustees, American Notes (third ed., p. 212; old ed., p. 144), Perry on Trusts (§§ 166 and 211).

I am of the opinion the decision and judgment in this case should not be sustained on the foregoing authorities, cited by the defendants' counsel. It is clear that Porter, Miner and Warren ought not, according to the rules of equity and good conscience, as administered in courts of chancery, to hold and enjoy all the notes and mortgages, or the entire avails thereof, in question in this action; and that in order to do complete justice to the plaintiff, the court should raise a trust by *construction* out of the facts in the case, and fasten it upon the consciences of those defendants, and convert them into trustees of the legal title, and order them to execute the trust in such manner as to protect the rights of the plaintiff. Such a trust is called a constructive trust. Such trusts differ from other trusts in that they are not within the intention or contemplation of the parties at the time the contract is made, from which they are construed by the court, but they are thrust upon a party contrary to his intention and against his consent. A court of equity, by raising a trust by construction, in a case like this, can do equal and complete justice between the parties. (See Perry on Trusts, *supra*, § 166; Hill on Trustees, *supra;* 4 Edwards' Ch. Rep., 215; 3 Mason's Rep., 232.)

It was provided by the Revised Statutes that " the right of action of any person injured by any felony shall not, in any case, be merged in such felony, or be in any manner affected thereby." (2 R. S., 292, § 2.) But that section has been repealed by section 73 of the Code, and section 7 of the Code has been substituted therefor, which is as follows : " Where the violation of a right admits of both a civil and criminal remedy, the right to prosecute the one is not merged in the other."

I think Porter, Miner and Warren should be regarded and held to be trustees, and be adjudged to hold the notes and mortgage in question, and the avails thereof, as trustees by construction, for the benefit of the plaintiff. The court should not refuse to allow a party to recover the avails of property stolen from him, on any technical grounds, when the

Newton *v.* Porter

merits of the case clearly require that he should recover; and the court should jump all technicalities, and be as astute in discovering a remedy for upholding the rights of such a party, as the thief is in contriving ways and means to cheat him out of his property, and the avails of it, by changing the same from one kind to another, and placing it in the hands of third persons.

The plaintiff should be regarded the owner of the avails of the bonds that were stolen from her, until some other person shows a better or superior equitable right thereto than she had. The mere changing such avails from one kind of property or security into another, or from money into securities, did not affect the plaintiff's right thereto. Where a willful trespasser converts another's corn into whiskey, the owner of the corn retains the title to the whiskey. (*Silsbury* v. *McCoon*, 3 Comst., 379.)

According to the conclusions of fact found by the justice at the Special Term, Porter, Miner and Warren received or held the notes and mortgage with notice or knowledge that they were given for, or were purchased with, money obtained by the thief, Warner, for bonds he had stolen from the plaintiff; and that with such knowledge, or after such notice, they have retained such notes and mortgage, or some of the avails thereof. And upon these conclusions of fact, justice and conscience require that the plaintiff should recover the notes and mortgage, or the avails thereof over and above that portion thereof which the justice at the Special Term found that those defendants were entitled to retain, on the ground that they received the same in good faith for services they rendered, and disbursements they paid for the thief and his wife before the notes became due, and before they had notice that the notes were given for, or that the mortgage was purchased with, money the thief obtained for the bonds he had stolen from the plaintiff. There is authority for allowing those defendants to hold the notes and mortgage as security to the extent I have mentioned, or for permitting them to retain such portion as I have mentioned of the avails of the notes

and mortgage. (See Perry on Trusts, § 166.)   But they cannot hold the notes or mortgage, or any money they have received thereon or therefor, for services they have rendered or for disbursements they have paid for the thief and his wife, or either of them, since they knew or had notice of the plaintiff's claim to the notes and mortgage, or the avails thereof.

For these reasons I am of the opinion the plaintiff was entitled to a relief and a judgment in the action, and that judgment given against her should be reversed, and a new trial granted, costs to abide the event.

Miller, P. J.   This action is of an equitable character, and was brought to compel the defendants to pay over and account for certain sums of money and securities which had passed into their hands, which were the avails and proceeds of certain bonds which had been feloniously stolen from the plaintiff.   The complaint was dismissed, and the injunction issued dissolved by the justice before whom the case was tried, upon the ground that the bonds having been stolen and sold by the felons, and the moneys arising therefrom invested, no trust was created or implied, and no cause of action was established as against the defendants.

I think the learned judge was clearly wrong in his decision, and am of the opinion that the action was properly brought and can be maintained.   Justice Story, in his commentaries on Equity Jurisprudence, says: " One of the most common cases in which a court of equity acts, upon the ground of implied trusts *in invitum*, is where a party has received money which he cannot conscientiously withhold from another party.   It has been well remarked that the receiving of money, which, consistently with conscience, cannot be retained, is, in equity, sufficient to raise a trust in favor of the party for whom or on whose account it was received. This is the governing principle in all cases ; and therefore the true question is not whether money has been received by a party, but whether he can now with a safe conscience, *ex æquo et bono*, retain it.   Illustrations of this doctrine are

familiar in cases of money paid by accident, a mistake or fraud." (2 Story's Eq. Jur., § 1255.) The proposition here laid down is a broad one, and would seem to cover almost every case where a party is in possession of money belonging to another, which he cannot conscientiously retain. No exception is made in favor of a person who occupies no fiduciary relation to another, and the elementary books generally do not notice any exception from the rule where the money or property has been obtained by means of a felony.

It would certainly be an anomaly in the history of legal proceedings, and a grave reflection upon the administration of justice, if a felon could invest the fruits of his crime, or dispose of them in such a manner as to place them beyond the reach of the law. The person whose property had been feloniously appropriated, in such an emergency, would be left without any redress whatever, while the felon would reap the pecuniary benefit arising from his crime. If convicted of the offence and punished by imprisonment, he might atone for the crime committed against the public, but, in this manner, could not restore to the sufferer the property which he had stolen. The law does not sanction any such absurdity.

In England it was established, as a general rule, that sales of personal property in market, *overt*, would bind the property even against the real owner; but this law has never been adopted in this country, and whenever any question has been presented in regard to it, the doctrine has been repudiated by American judicial tribunals. (2 Kent Com., 323, 324; *Hoffman* v. *Carow*, 22 Wend., 285.) The title upon a sale of personal property rests upon the fundamental principle that "*Nemo plus juris in alium transferre potest, quam ipse habet.*" The doctrine that the private injury is merged in the public wrong has never prevailed in this State, and the intervention of a felony is generally no barrier to the right to personal property stolen, in the hands of any person who may hold it, or the proceeds thereof.

As early as 1801 a law was enacted in this State which pro-

vided that the civil remedy should not be merged in the felony, or in any way be affected thereby. (Laws of 1801, chap. 60, § 19; R. L. of 1802, 264; 1 R. L. of 1813, 499.) The Revised Statutes contain a similar enactment (2 R. S., 292, § 2); and the Code (§ 7), in accordance with this provision, declares that " when the violation of a right admits of both a civil and criminal remedy, the right to prosecute the one is not merged in the other." The statute was explicit and comprehensive, and the Code has only followed its provisions. It would seem, then, to be a necessary result, that the fact of a felony being committed is in no way to be regarded as affecting the right to follow the property feloniously taken. At common law, the true owner had a right to reclaim his property, and to hold any one responsible who had assumed a right to interfere with or dispose of it. (2 Kent, 325; *Hoffman* v. *Carow*, 22 Wend., 285, 294, 295; *Williams* v. *Merle*, 11 Wend., 80; *Gordon* v. *Hostetter*, 37 N. Y., 99).

In *Barret* v. *Spofford* (45 N. Y., 387), it was held that, by the larcenous taking of chattels, the owner is not divested of his property, and a transfer to a *bona fide* purchaser does not impair his rights, and the owner may follow and reclaim them wherever he can find them; and a carrier or other bailee can stand in no better situation than a purchaser who has received them in good faith and for full value.

If the plaintiff had a remedy at law to bring an action for the money stolen, clearly he would be entitled to equitable relief, where the circumstances were such as to require an appeal to the equitable powers of the court. The bonds here had been converted into money, the money into securities, and these securities were held in such a manner and by such varied interests that this would be beyond the reach of any strict legal remedy, and only within the comprehensive scope of a bill in equity, where all the parties could be brought in and every right protected, so as to adjust and determine the entire merits of the case. This remedy is manifestly appropriate, and within the jurisdiction of the court in the exercise of its equitable powers.

The defendants' counsel rely upon several authorities to sustain the principle that it is necessary to bring this case within the doctrine of implied trusts. If the cases referred to were susceptible of any such construction as is claimed, then the plaintiff would be remediless, and the felon would escape with his ill-gotten gain, in defiance of the law and to the great discredit of human justice, which has sought to make the law subservient to its purposes.

The defendants' counsel relies upon some reported cases, which deserve examination. In *The President, Directors & Co. of the Pascoag Bank* v. *Hunt and others* (3 Edw. Ch., 583), the complaint charged the former cashier of the bank, one of the defendants, with abstracting funds and investing them in the purchase of a bond and mortgage, and asked that the loan might be decreed to have been made on account of the complainants, and the securities taken for their benefit, in whole or to the extent to which the moneys were used; that the said Hunt might be decreed to assign to the complainants the said securities, or so much thereof as they might be entitled to, and that the parties liable on the bond and mortgage be directed to pay to the complainants accordingly. The complainants also asked for an injunction, which was granted. Upon a motion to dissolve the injunction, the vice-chancellor held that the complainants must be left to pursue the cashier in a court of criminal jurisdiction, and, if found guilty, the court had no authority to indemnify the complainants for their loss out of property acquired by Hunt. The opinion of the court is brief, and does not enter upon a full discussion of the merits of the question involved, nor is any authority cited to sustain the position taken. If the case can be considered as an authority for the doctrine contended for, I think it is overruled and rendered of no account by the subsequent decision of the same court, and the same judge, which, as I understand, holds entirely a different doctrine. (*The Bank of America* v. *Pollock and others*, 4 Ed. Ch. R., 215.) The bill in the case last cited charged that Pollock, who was a clerk of the plaintiff, had purchased cer-

tain shares of stock, and paid for the same with the funds of the complainants, fraudulently abstracted, and taken from them by him, which it was claimed they had a right to follow in the hands of third parties, and it was held that a case of constructive trust in equity was made out in favor of the complainants to have the benefit of the property in which their money, although not directly, yet indirectly, had been invested, and to which no other person, except volunteers, had acquired any title or interest. The vice-chancellor says: I consider that this case falls within the principle laid down by Mr. Justice STORY, in 2 Com. Eq., 503, § 1258. The identity of the property is shown and traced, and, under such circumstances, *it can be laid hold of by a court of equity*, and distinguished from the property of all other persons, and *handed over to the equitable and rightful owners.* The fraudulent abstraction of the funds alleged was clearly a felony, and not a breach of contract, and the case cited is an authority in favor of the plaintiffs in this action.

Both the cases were decided by a single judge, and no appeal was taken from either of them. Nor is there any other case cited from this State to sustain the doctrine contended for by the defendants' counsel.

*Hawthorne* v. *Brown* (3 Sneed [Tenn.], 462) was an action of trover to recover for the conversion of personal property, and it was laid down that the principle which authorizes a beneficiary of a trust to sue at law for property wrongfully converted, or to disclaim title, and proceed upon his remedy *in personam*, has no application where a person, standing in no fiduciary relation, wrongfully obtains a portion of a trust fund, and invests the same in property for his own benefit, without the knowledge and against the will of the trustee and beneficiary. There was no felonious taking of the property, and hence no such question as the one now raised was presented to the court.

In *Ensley* v. *Balentine* (4 Humph. [Tenn.], 233), it was questioned, whether, if a father or other person take into possession the property of another, acting under a claim of

right in himself, and sell such property, investing the proceeds in lands, a trust would result in favor of the true owner of the property so taken.

*Campbell* v. *Drake* (4 Iredell, N. C., 94) was a bill in equity to reach land which had been purchased by a clerk in a store with pilfered money and goods taken from his employer, and it was held that the person thus robbed could hold neither the clerk nor his representatives after his death as trustees of the land for his benefit, so as to enable him to call for a conveyance of the legal title himself. It will be observed that this was a proceeding to obtain land without first obtaining a judgment for the claim, and the learned judge who wrote the opinion says: " We will not say, if the plaintiff had obtained a judgment against the administrator for the money as a debt, that he might not come here to have the land declared liable as a security for the money laid out for it." So it would appear that there is a way of reaching even real estate which is purchased as the proceeds of a felony. If this case can be considered as in point, then, I think, it is not applicable in this State, where the law intervenes and prevents the civil remedy being merged in the felony. But, independently of this consideration, I cannot concur in the doctrine that a felon can so dispose of the proceeds of his crime as to place them beyond the reach of the real owner, and therefore, I think, with due respect to the learned court, that the decision is erroneous and cannot be considered as a binding authority.

The citation from Perry on Trusts, 102 and 103, rests entirely upon the authority of the cases last cited; and if any of them can be considered as upholding the principle sought to be maintained by the defendant's counsel, then, in my opinion, they are unsound and should not be followed.

*Thompson* v. *Parkins* (3 Mason C. C. U. S. Rep., 232) is a strong authority the other way. Upon principle and authority, I entertain no doubt that the plaintiff's action was properly brought.

I am also of the opinion that the defendants had no claim

upon the property for moneys, as counsel, after notice of the plaintiff's claim. While upholding the principle that counsel, in the discharge of their duty, should be faithful and vigilant, and, perhaps, in accordance with the chivalric sentiment of a late distinguished English jurist, in the performance of that duty should even know no one else besides their client, I cannot subscribe to the doctrine that they have a right to money feloniously stolen by an offender to defend him from the crime alleged. While they would be perfectly justified in declining to act further after the pecuniary arrangements made on their behalf have failed, if they choose to continue in the service, in despite of this fact, they must take the consequences arising from their devotion to the interest committed to their charge or their mistaken zeal.

As the judge was clearly wrong on the trial, the judgment must be reversed and a new trial granted, with costs to abide the event.